REL: March 24, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

_____

## CR-21-0393

_____

## Benjamin Young

### v.

## State of Alabama

## Appeal from Colbert Circuit Court
## (CC-16-339.60)

KELLUM, Judge.

Benjamin Young appeals the circuit court's summary dismissal of his petition for postconviction relief filed pursuant to Rule 32, Ala. R. Crim. P., attacking his capital-murder conviction and sentence of death.

In February 2018, Young was convicted of murdering Ki-Jana Freeman by shooting Freeman while he was in a vehicle, an offense defined as capital by § 13A-5-40(a)(17), Ala. Code 1975, and assault in the first degree for shooting Tyler Blythe, a violation of § 13A-6-20(a), Ala. Code 1975.[1] The jury recommended by a vote of 11 to 1 that Young be sentenced to death. The circuit court sentenced Young to death for the capital-murder conviction and to 20 years' imprisonment for the assault conviction. This Court affirmed Young's convictions and sentences. See Young v. State, [Ms. CR-17-0595, August 6, 2021] ___ So. 3d ___ (Ala. Crim. App. 2021). The Alabama Supreme Court denied certiorari review. See Ex parte Young, (No. 1210291, October 21, 2022).

In July 2020, Young filed a Rule 32 petition attacking his capital-murder conviction and sentence of death. (C. 7-107.) The State filed its response and moved to dismiss the petition. (C. 120-221.) Young responded to the State's motion. (C. 222.) In January 2022, the postconviction court issued a 124-page order summarily dismissing

---

[1]Blythe was shot 13 times but survived his injuries. He testified at Young's trial.

Young's petition. (R. 640-763.) Young then filed a timely notice of appeal to this Court. (C. 780.)

## Section 13A-5-53.1, Ala. Code 1975

The postconviction petition in this case was filed in compliance with § 13A-5-53.1, Ala. Code 1975, and while Young's direct appeal from his capital-murder conviction was pending in the Alabama appellate courts. That statute specifically provides that Rule 32.2(c), Ala. R. Crim. P., which governs the limitation period in which to file a postconviction petition, does not apply to death-penalty cases or to any defendant sentenced to death after August 1, 2017. See § 13A-5-53.1(j), Ala. Code 1975. Pursuant to § 13A-5-53.1(c), Ala. Code 1975, a defendant sentenced to death shall have 365 days from the date the appellant's first brief was filed on direct appeal to file a timely postconviction petition. Also, the circuit court, for good cause, may grant one 90-day extension in which to file that postconviction petition. See § 13A-5-53.1(d), Ala. Code 1975.

Based on this Court's records,[2] Young's first brief on direct appeal was filed on April 10, 2019. Young sought and was granted a 90-day extension to file his postconviction petition. Young's petition was due to be filed by July 8, 2020, and was timely filed on July 7, 2020. See § 13A-5-53.1, Ala. Code 1975. See Ex parte Marshall, 323 So. 3d 1188 (Ala. 2020); Stanley v. State, 335 So. 3d 1 (Ala. Crim. App. 2020).

Facts

In August 2021, this Court affirmed Young's capital-murder conviction and his sentence of death. In our opinion, we summarized the facts surrounding Young's convictions:

"On March 1, 2016, Young attended a meeting of a gang called the 'Almighty Imperial Gangsters' held by Thomas Hubbard, the leader of the gang, in Hubbard's bedroom at his mother's house on Midland Avenue in Muscle Shoals. Other members at the meeting were Peter Capote, Dewayne Austin Hammonds, Riley Hamm III, De'Vontae Bates, and Michael Blackburn. Two days earlier the Hubbards's house had been burglarized while Hubbard was attending his grandmother's funeral. Several items were stolen from the house, including a television, an Xbox game console, a PlayStation game console, and some cash. Hubbard reported the burglary to the Muscle Shoals Police Department. Officer Raymond Schultz of the Muscle Shoals Police Department, who responded to the burglary call, testified at trial that Hubbard was upset and angry about the burglary. (R. 463.)

---

[2]This Court may take judicial notice of its own records. See Hull v. State, 607 So. 2d 369, 371 n. 1 (Ala. Crim. App. 1992).

4

"Hubbard told everyone in the meeting on March 1 that he wanted to find and kill the person who burglarized his house. Hubbard asked the gang for help. Bates testified that in the meeting they developed a plan to find out who broke into Hubbard's house and then 'lure him to a place' and kill him. (R. 749.)

"Hammonds, who owned the Xbox game console stolen from Hubbard's house, testified that he told Hubbard at the meeting that [Ki-Jana] Freeman might have taken the Xbox. Hammonds knew Freeman from working with him in the past, and he had seen a Facebook post by Freeman advertising an Xbox for sale. The gang developed a plan for Hammonds to meet with Freeman to see if the Xbox Freeman was offering to sell was Hammonds's Xbox. Although the plan changed throughout the meeting, the gist of the plan was that Hammonds (either alone or with Hamm) would meet with Freeman and, if the Xbox was the one stolen from Hubbard's house, Hammonds would signal to or call Young and Capote, who would take Freeman somewhere to interrogate and kill him. Hammonds testified that Young, Capote, and Hubbard planned to use Hubbard's SKS rifle and a pistol to kill Freeman. (R. 815.) Bates testified that besides the SKS rifle, Hubbard owned a .22-caliber revolver and a .45-caliber handgun. The State introduced an undated photograph showing Hubbard standing in his bedroom holding an SKS rifle.

"Hammonds testified that he sent a message to Freeman on Facebook Messenger about the Xbox. Hammonds and Freeman communicated throughout the day about Hammonds purchasing the Xbox from Freeman. Hammonds's Facebook Messenger exchange with Freeman was introduced at trial.

"A little before 9:00 p.m., Young and his girlfriend, Meagan, along with Capote and his girlfriend, Bridgette, left Hubbard's house to buy ammunition for the SKS rifle.

5

Meagan testified that Young drove Meagan's car to the Gander Mountain outdoor retail store in Florence. Young asked Meagan to buy the ammunition, and he told her what kind of ammunition to buy. The State introduced surveillance footage from Gander Mountain showing Meagan's car pulling into the Gander Mountain parking lot. Surveillance footage from inside the store showed Meagan buying the ammunition at 9:01 p.m., and a receipt from the store showed that Meagan bought a box of 7.62X39-millimeter ammunition. The surveillance footage showed Meagan returning to the car and the car leaving the parking lot. Meagan testified that after she bought the ammunition Young drove them back to Hubbard's house.

"Around the time Young, Capote, Meagan, and Bridgette got back to Hubbard's house from Gander Mountain, Hammonds left to go to work at a Wal-Mart in Florence. At 9:28 p.m., Hammonds sent Freeman a message asking him to call him, and he gave Freeman his cellular telephone phone number. Freeman did not call Hammonds but sent a message asking if Hammonds still wanted the Xbox. Hammonds testified that he never arranged a meeting with Freeman and that when he left for work around 9:30 p.m., the plan was for Bates to 'handle it' by setting up Freeman. (R. 823.) Hammonds said that Young, Capote, Hubbard, Bates, Hamm, and Blackburn were at Hubbard's house when he left for work and that the plan was for them to use 'the white Ram' to 'go kill him.' (R. 826-27.) The State introduced Hammonds's timecard from Wal-Mart showing that Hammonds clocked in to work a little before 10:00 p.m. on March 1 and clocked out a little after 6:00 a.m. the next morning.

"Around the time Hammonds left for work, Bates sent Freeman a message on Facebook Messenger asking him if he had '11 hits' of acid he could purchase. (R. 757-58.) Bates explained that he volunteered to lure Freeman to the Spring Creek Apartments by asking Freeman if he could buy some

6

acid from him. Bates admitted he knew he was setting up Freeman so that the others could kill him.

"A little after 10:30 p.m., Young, Capote, Hubbard, and Hamm left Hubbard's house in a white pickup truck. Young was driving and Capote was in the front passenger's seat. Hubbard and Hamm were in the backseat. They had with them two large black garbage bags. Bates testified that he stayed at Hubbard's house and continued exchanging messages with Freeman. Bates relayed all the information he received from Freeman to one of the gang member's girlfriends, who was at the house with Bates, and the girlfriend relayed the information to Young, who was in the truck on the way to the Spring Creek Apartments.

"The State introduced surveillance video from the Spring Creek Apartments showing a white four-door Dodge pickup truck pulling into the apartment complex around 10:47 p.m. Several minutes later Freeman sent Bates a message: 'Boutta pull in. Just passed Fred's.' Bates asked, 'What kinda car u in cause im in the back.' (C. 479.) Freeman responded at 10:58 p.m., 'Blue Mustang. Pulling in now. The back on the right road or the left road.' The surveillance video shows a blue Mustang vehicle pulling into the parking lot of the Spring Creek Apartments at 10:58 p.m.

"Haley Burgner, Freeman's girlfriend, testified that on the afternoon of March 1 she and Freeman were communicating on Facebook Messenger. Freeman told her he planned to meet "Dewayne" to sell him an Xbox. (R. 508.) Freeman told Burgner that Tyler Blythe was with him in case anything 'goes down.' Later Freeman told Burgner that he was heading to meet 'Vonte' to get some money that Vonte owed him. At 10:58 p.m., Freeman sent a message to Burgner that he was 'getting my cash r[ight] n[ow].' The Facebook Messenger exchange between Freeman and Burgner was admitted into evidence.

7

"Blythe testified that on March 1 he was with Freeman when Freeman asked him to ride with him to the Spring Creek Apartments to meet Bates. Blythe testified that Freeman pulled into the parking lot of the Spring Creek Apartment complex and parked the car. Blythe asked Freeman why they were there, and Freeman told Blythe they were there to sell some acid strips.

"While they were sitting in Freeman's car in the parking lot, Blythe and Freeman turned around in their seats to look at a white pickup truck that had backed up in the parking lot. Blythe testified that they had just turned back around when Freeman looked in the rearview mirror and said something to Blythe and then, Blythe said, 'they started shooting.' (R. 556.) Freeman and Blythe were each shot several times. Blythe did not know how many shooters there were, but, he said, 'it seemed like more than one.' (R. 559.) Freeman was unresponsive at the scene and was pronounced dead a short time later. Blythe was taken by ambulance from the scene and airlifted to Huntsville Hospital, where he underwent surgery and was hospitalized for seven days.

"Jodi Bohn testified that around 11:00 p.m. on March 1 she was looking out of her apartment window at the Spring Creek Apartments when she saw a white pickup truck back out of a parking space and stop next to a curb. Bohn saw the doors of the truck open. The driver and the front-seat passenger got out of the truck and started walking toward the back of the truck. Bohn heard gunfire that she thought came from more than one weapon, so she moved away from the window. Bohn described the driver of the pickup truck as 'big and heavy.' (R. 592.) The record shows that Young was 6 feet 4 inches tall and weighed 270 pounds. (C. 72.)

"In March 2016 Dale Springer lived in an apartment at the Chateau Orleans apartments in Muscle Shoals. Shortly after midnight on March 2, Springer went outside to smoke a cigarette. Springer saw a white Dodge pickup truck with a double cab pull into the parking lot of the Chateau Orleans

8

complex 'pretty fast' and back into a parking space. (R. 624.) Two men got out of the truck. Springer saw a 'light silver' or 'light gold' four-door automobile pull into the parking lot. The driver of the truck spoke with someone in the car, and the car left. The two men from the truck walked away, staying in the dark area of the apartment complex. Later that morning Springer heard on the radio that police were looking for a white Dodge pickup truck involved in a shooting, so Springer called the police. Law-enforcement officers learned that the white truck had been stolen earlier that year.

"Det. [Wes] Holland testified that, after interviewing Burgner the morning after the shooting, he began looking for Hammonds and Bates. He interviewed Bates on March 3 and Hammonds on March 4. Hammonds viewed the surveillance video from the Spring Creek Apartments and identified Young as the driver of the white truck and Capote as the passenger. Hammonds told Det. Holland that, after the shooting, Young told him that there were '15 shots that fired off' and that he 'took care of it.' (R. 830.) At trial both Hammonds and Bates testified that they had seen the surveillance video from the Spring Creek Apartments and that Young was the driver of the white pickup truck.

"During his interview with Det. Holland on March 4, Hammonds provided Young's and Capote's names and Hubbard's name and address. Hubbards' house was located about one block from Chateau Orleans, where two days earlier law-enforcement had located the white pickup truck. Det. Holland and Captain Stuart Setliff of the Tuscumbia Police Department immediately went to Hubbard's house to set up surveillance. They saw Young leave the house in a silver car. When other law-enforcement officers tried to stop Young, Young 'accelerated to a high rate of speed.' (R. 933.) Young led officers from several law-enforcement agencies on a chase across state lines into Tennessee, where Young eventually wrecked the car and was arrested.

9

"Det. Holland took a DNA swab from Young, and Young's DNA matched the DNA on a soda can found in the white pickup truck. DNA from a cigarette butt found in the pickup truck matched DNA from a swab taken from Capote.

"Shawn Settles testified that, from August 2015 to May 2016, he was in the Colbert County jail awaiting trial on a second-degree-robbery charge and a fraudulent-use-of-a-credit-card charge. In March 2016 Hubbard, who had been arrested for Freeman's murder, became Settles's cellmate. Capote, who had also been arrested for Freeman's murder, was placed in a nearby cell. Settles testified that Hubbard and Capote communicated with each other and with Settles about the details of Freeman's murder. Settles helped Hubbard and Capote pass notes back and forth to each other, and, rather than destroy the notes for Hubbard as Hubbard thought Settles was doing, Settles secretly kept the notes. Settles testified at trial that he had been convicted of second-degree robbery and fraudulent use of a debit card and that he was testifying at trial based on an agreement with the State.

"Based on information from Settles, law-enforcement officers got a search warrant for property in Franklin County, Alabama. Law-enforcement officers found an SKS rifle and a black magazine for the SKS buried in two black garbage bags on the property."

Young, ___ So. 3d at ___ (footnotes omitted).

Two of Young's accomplices have been convicted for their roles in the murder of Freeman and the assault of Blythe. Peter Capote was convicted of capital murder and assault in the first degree and was sentenced to death. This Court affirmed his conviction and death sentence on direct appeal. See Capote v. State, 323 So. 3d 104 (Ala. Crim.

10

App. 2020). Thomas Hubbard was convicted of capital murder and assault in the first degree and was sentenced to life imprisonment without the possibility of parole. This Court affirmed his conviction and sentence on direct appeal. See Hubbard v. State, 324 So. 3d 855 (Ala. Crim. App. 2019).

As noted above, two of Young's accomplices testified at Young's trial -- Austin Hammonds and De'Vontae Bates. Hammonds testified that at the time of Young's trial he had not been charged with any offense related to the murder and assault. (Trial R. 840-43.) Bates testified that he had been convicted of conspiracy to commit murder but was awaiting his sentence for that conviction. In exchange for Bates's truthful testimony at Young's trial, Bates said, the State would recommend that his sentence for that conviction be 20 years. (Trial R. 722.)

Standard of Review

Young filed this postconviction petition attacking his capital-murder conviction and sentence of death. According to Rule 32.3, Ala. R. Crim. P., Young bears the sole burden of pleading all of his claims in his petition.

> "The petitioner shall have the burden of pleading and
> proving by a preponderance of the evidence the facts

11

necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."

According to Rule 32.7(d), Ala. R. Crim. P., a circuit court may summarily dismiss a petition:

"If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing."

Rule 32.6(b), Ala. R. Crim. P., further provides:

"The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."

In regard to the pleading requirements of Rule 32, Ala. R. Crim. P., this Court has stated:

"'Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.' Boyd v. State, 746 So. 2d 364, 406 (Ala. Crim. App. 1999). In other words, it is not the pleading of a conclusion 'which, if true, entitle[s] the petitioner to relief.' Lancaster v. State, 638 So. 2d 1370, 1373

12

(Ala. Crim. App. 1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R. Crim. P., to present evidence proving those alleged facts."

Boyd v. State, 913 So. 2d 1113, 1125 (Ala. Crim. App. 2003).

We have characterized the burden of pleading in regard to a postconviction petition as a heavy burden. Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006).

"Although postconviction proceedings are civil in nature, they are governed by the Alabama Rules of Criminal Procedure. See Rule 32.4, Ala. R. Crim. P. The 'notice pleading' requirements relative to civil cases do not apply to Rule 32 proceedings. 'Unlike the general requirements related to civil cases, the pleading requirements for postconviction petitions are more stringent....' Daniel v. State, 86 So. 3d 405, 410-11 (Ala. Crim. App. 2011). Rule 32.6(b), Ala. R. Crim. P., requires that full facts be pleaded in the petition if the petition is to survive summary dismissal. See Daniel, supra. Thus, to satisfy the requirements for pleading as they relate to postconviction petitions, Washington was required to plead full facts to support each individual claim."

Washington v. State, 95 So. 3d 26, 59 (Ala. Crim. App. 2012).

"'An evidentiary hearing on a [Rule 32] petition is required only if the petition is "meritorious on its face." Ex parte Boatwright, 471 So. 2d 1257 (Ala. 1985). A petition is "meritorious on its face" only if it contains a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the facts relied upon (as opposed to a

13

> general statement concerning the nature and effect of those facts) sufficient to show that the petitioner is entitled to relief if those facts are true. Ex parte Boatwright, supra; Ex parte Clisby, 501 So. 2d 483 (Ala .1986).'

"Moore v. State, 502 So. 2d 819, 820 (Ala. 1986)."

Bracknell v. State, 883 So. 2d 724, 727-28 (Ala. Crim. App. 2003).

The majority of the claims raised by Young involve allegations that his counsel's performance at his capital-murder trial was deficient. When reviewing a claim of ineffective assistance of counsel, we apply the standard adopted by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

Strickland, 466 U.S. at 687.

Regarding claims that counsel's performance was deficient, this Court has stated:

14

"To sufficiently plead an allegation of ineffective assistance of counsel, a Rule 32 petitioner not only must 'identify the [specific] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' 466 U.S. at 694, 104 S.Ct. 2052. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient."

Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006).

A postconviction petition may also be summarily dismissed on the merits of the claims raised in the petition.

"'"Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition."' Bishop v. State, 608 So. 2d 345, 347-48 (Ala. 1992) (emphasis added) (quoting Bishop v. State, 592 So. 2d 664, 667 (Ala. Crim. App. 1991) (Bowen, J., dissenting)). See also Hodges v. State, 147 So. 3d 916, 946 (Ala. Crim. App. 2007) (a postconviction claim is 'due to be summarily dismissed [when] it is meritless on its face')."

Bryant v. State, 181 So. 3d 1087, 1102 (Ala. Crim. App. 2011).

Last, "[t]his Court may affirm the judgment of the circuit court for any reason, even if not for the reason stated by the circuit court." Acra v. State, 105 So. 3d 460, 464 (Ala. Crim. App. 2012).

15

At trial, Young was represented by attorneys Ben Gardner, Jr., Nathan Johnson, and Leigh Anne Landis.

<u>Guilt-Phase Issues</u>

I.

Young argues that the postconviction court erred in summarily dismissing his claims that his counsel was ineffective at the guilt phase of his capital-murder trial because, he says, counsel failed to adequately investigate and present evidence that he was not guilty. Young raises numerous claims regarding this issue -- we review each claim individually.

Initially, Young argues that, when summarily dismissing his claims, the postconviction court confused the burden of pleading with the burden of proof and incorrectly dismissed his claims of ineffective assistance of counsel.

This Court has discussed the distinction between the burden of pleading and burden of proof in relation to a postconviction proceeding:

> "'[A]t the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence. Rather, at the pleading stage, a petitioner must only provide "a clear and specific statement of the grounds upon which relief is

16

sought." Rule 32.6(b), Ala. R. Crim. P. Once a petitioner has met his burden of pleading so as to avoid summary disposition pursuant to Rule 32.7(d), Ala. R. Crim. P., he is then entitled to an opportunity to present evidence in order to satisfy his burden of proof.'

"Ford v. State, 831 So. 2d 641, 644 (Ala. Crim. App. 2001). A claim may not be summarily dismissed because the petitioner failed to meet his burden of proof at the initial pleading stage, a stage at which the petitioner has only a burden to plead. See Smith v. State, 581 So. 2d 1283, 1284 (Ala. Crim. App. 1991) ('When the State does not respond to a petitioner's allegations, the unrefuted statement of facts must be taken as true. Chaverst v. State, 517 So. 2d 643, 644 (Ala. Crim. App. 1987). Further, when a petition contains matters which, if true, would entitle the petitioner to relief, an evidentiary hearing must be held. Ex parte Boatwright, 471 So. 2d 1257, 1258 (Ala. 1985).')."

Johnson v. State, 835 So. 2d 1077, 1079–80 (Ala. Crim. App. 2001). For the reasons stated in this opinion, we conclude that the postconviction court did not confuse the burden of pleading with the burden of proof. See Bryant v. State, 181 So. 3d 1087, 1102 (Ala. Crim. App. 2011).

Young further argues that the postconviction court erred in considering his ineffective-assistance-of-counsel claims individually and not cumulatively as, he says, the law mandates. "When considering whether the claims of ineffective assistance of counsel were sufficiently pleaded, the circuit court correctly considered each claim individually."

17

<u>Washington v. State</u>, 95 So. 3d 25, 58 (Ala. Crim. App. 2012).  "[T]o satisfy the pleading requirements of Rule 32, each claim of a petition must contain a clear and specific statement of the grounds for relief and the underlying facts that, according to the petitioner, provide the basis for the grounds for relief.  Even ineffective assistance of counsel claims must be pleaded sufficiently."  <u>Taylor v. State</u>, 157 So. 3d 131, 139-40 (Ala. Crim. App. 2010).  Nothing in the postconviction court's order reflects that it considered the wrong burden of proof or that it violated this Court's holding in <u>Washington</u>, supra.  Thus, this claim is meritless.

The State first asserts that the majority of the issues raised by Young in his brief to this Court are waived, pursuant to Rule 28(a)(10), Ala. R. App. P., because Young's brief is substantially the same as the postconviction petition that Young filed in the Colbert Circuit Court. The State relies on this Court's decision in <u>Morris v. State</u>, 261 So. 3d 1181 (Ala. Crim. App. 2016), to support this argument.  In <u>Morris</u>, we stated:

> "Morris's obligation as the appellant was to present an argument in support of his position on appeal, and his argument on appeal is that the circuit court erred when it dismissed the claims of ineffective assistance of counsel. With respect to that issue, Morris was required to set out the reasons supporting his argument that the circuit court erred,

18

> with citations to legal authorities supporting that argument, and citation to parts of the record relied on as support for his claim of error. Morris's argument that the trial court improperly dismissed the 19 claims of ineffective assistance of counsel is unsupported by any of the above. The mere repetition of the claims alleged in the Rule 32 petition does not provide any analysis of the circuit court's judgment of dismissal; obviously there was no judgment of dismissal until after the petition was filed."

Morris, 261 So. 3d at 1194-95. Young's postconviction petition is 104 pages in length and his brief is 98 pages. While some issues raised in Young's postconviction petition are very similar to the arguments made on appeal, they are not identical. Indeed, the State does not make this argument for every issue that Young raises in his brief to this Court. Accordingly, we will consider Young's arguments on appeal.

## A.

Young first argues that his trial counsel was ineffective for failing to interview Colton Vickery, "a peer of Austin Hammonds," and for failing to present Vickery's testimony at Young's trial. (Young's brief at p. 58.) Young pleaded in his postconviction petition that Vickery told an investigator that he and De'Vontae Bates planned to kill both Freeman and Blythe. Young pleaded that Vickery's testimony "would have suggested to the jury that Hammonds was more involved than he

19

portrayed and would have controverted Bates's testimony, thus undermining the State's case." (C. 131.)

When addressing Young's claim that trial counsel was ineffective for failing to interview Vickery, the postconviction court made the following findings:

"Young fails to state a valid claim for relief or present a material issue of fact or law under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. Testimony from Vickery that Bates and Hammonds targeted Blythe and Freeman would have been cumulative to the testimony presented at trial. Bates testified that he targeted Freeman for the theft of Hubbard's Xbox and intended Freeman's death. Hubbard likewise testified that Freeman was targeted. '[A] petitioner cannot satisfy the prejudice prong of the Strickland [v. Washington, 466 U.S. 668 (1984)] test with evidence that is merely cumulative of evidence already presented at trial.' Benjamin v. State, 156 So. 3d 424, 453 (Ala. Crim. App. 2013).

"Moreover, Young fails to satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. Young fails to sufficiently plead how failure to interview Vickery and present his testimony fell below any standard of professional norm. Young suggests that counsel's actions were unreasonable as compared to those of Capote's and Hubbard's counsel, because in their trials, Vickery testified. However, the Court notes that Capote was convicted and sentenced to death and Hubbard was convicted and sentenced to life without the possibility of parole. In light of this fact, Young's failure to explain how the testimony of Vickery would have changed the result of his own case is significant.

20

"Furthermore, Young fails to plead how counsel's 'failure' was not part of a reasonable trial strategy. Calling Vickery to testify would have exposed the jury to another witness connected to gang activity. Distancing Young from further unnecessary, cumulative gang activity is a reasonable trial strategy in a case predicated on gang activity. Young likewise fails to plead how counsel's actions actually prejudiced him in light of the testimony given by Bates and Hammonds. Thus, Young fails to plead facts that, if true, would prove either Strickland [v. Washington, 466 U.S. 668 (1984),] prong. Such 'bare claims' are insufficient to warrant further proceedings. Rule 32.6(b), Ala. R. Crim. P."

(C. 657-58.)

To sufficiently plead a claim regarding counsel's failure to call a witness, this Court has stated that

"a Rule 32 petitioner is required to identify the names of the witnesses, to plead with specificity what admissible testimony those witnesses would have provided had they been called to testify, and to allege facts indicating that had the witnesses testified there is a reasonable probability that the outcome of the proceeding would have been different."

Mashburn v. State, 148 So. 3d 1094, 1151 (Ala. Crim. App. 2013).

Summary dismissal of this claim was proper because Young failed to plead how he was prejudiced, i.e., that there was a "reasonable probability that the outcome of the proceeding would have been different" had Vickery testified. Mashburn, 148 So. 3d at 1151.

21

Also, several witnesses testified that Hammonds targeted Freeman because he had stolen an Xbox from Hubbards's house and that the gang planned to lure Freeman to the parking lot of an apartment complex to kill him.

> "The fact that there were other witnesses available who could have testified ... does not demonstrate that counsel was ineffective in choosing the theory and strategy that was presented at the penalty phase.' Barnhill v. State, 971 So. 2d 106, 116 (Fla. 2007). '[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative.' Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009). 'Whether to present certain testimonial evidence is a matter of trial strategy, and complaints of uncalled witnesses are generally disfavored.' Sanders v. United States, 314 Fed. App'x 212, 213 (11th Cir. 2008)."

Walker v. State, 194 So. 3d 253, 291 (Ala. Crim. App. 2015).

Indeed, the evidence against Young was compelling. The State presented evidence indicating that Young's girlfriend purchased ammunition on the night of the shootings. Several people who lived nearby testified that a white pickup truck drove into the area right before the shooting started; one witness said that the driver, who was big and heavy, got out and walked toward another car. DNA evidence discovered on a soda can found in the truck matched Young's DNA. Surveillance

video showed a white truck come into the complex and a heavy set man[3] exit the driver's side of that truck. Finally, two of Young's accomplices testified that Young was one of the two men shooting at the two victims.

In a one-paragraph argument in this section of Young's brief, Young argues that his trial counsel was ineffective for failing to obtain information from Hammonds's cellular telephone that had been turned over to police during the investigation. Young's pleadings on this claim merely consist of the following: "Counsel knew that Hammonds had identified Freeman as a target and initiated the plan to contact and lure Freeman to the site where he was killed. Counsel knew that this phone was obtained by the State yet sought no discovery of its contents." (C. 24.)

In finding that this claim had no merit and was insufficiently pleaded, the postconviction court stated:

> "Young fails to state a valid claim for relief or present a material issue of fact or law under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. Information obtained from Hammonds's phone that he targeted and initiated a plan to lure Freeman to his death would have been cumulative to the evidence presented at trial. …

---

[3]"Young was 6 feet 4 inches tall and weighed 270 pounds," at the time of the shootings. Young, ___ So. 3d at ___.

23

"Moreover, Young fails to satisfy the specificity and full factual pleading requirements of Rule 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. Young fails to plead what specific, relevant, and admissible evidence could have been obtained from Hammonds's phone. "

(C. 659.)

Young failed to plead what evidence was on Hammonds's cellular telephone that counsel failed to obtain and failed to plead how he was prejudiced by the failure to obtain that evidence. Young failed to plead the full facts to comply with the pleading requirements of Rule 32.6(b), Ala. R. Crim. P. Therefore, summary dismissal was proper, and Young is due no relief on this claim.

### B.

Young next argues that his trial counsel was ineffective for failing to develop and present a coherent defense theory. He makes several different arguments in support of this claim.

### 1.

First, Young argues that his trial counsel failed to offer an adequate opening statement. Specifically, Young pleaded that defense counsel's opening statement was incoherent and that in that statement counsel told the jury that the defendant had not been present at the shootings

but had no evidence to support that assertion and did not present any such evidence at trial.

In summarily dismissing this claim, the postconviction court made the following pertinent findings:

"It is plain from the face of the record that, as [Ben] Gardner indicated he would do during his opening, counsel questioned Hammonds and Bates as to their own involvement in the murder, motives to lie and point the finger at Young, plea deals, and ability to identify Young from the Spring Creek Apartments security footage despite the quality of the video. And as Young acknowledges in his petition, counsel introduced the idea that Hammonds and Bates could not be trusted to give accurate, truthful, and unbiased testimony during opening statements. Notably, trial counsel returned to that theory in closing arguments. Moreover, this strategy served to remind the jury that the prosecutor's passionate opening statement was not evidence, but rather, what mattered most was the credibility of the witnesses. Consequently, it is clear on the face of the record that trial counsel presented a reasonable defense theory, challenged the State's theory, and developed the defenses discussed in opening statements.

"Moreover, Young fails to satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. The State's theory of the case was that Young was present at, and helped commit, the murder of Freeman. Trial counsel refuted this theory by asserting Young's innocence: 'He didn't do it. He wasn't there.' … Young fails to name any witness that counsel could have called, what questions counsel could have asked that witness, and if that witness would have been willing to testify. …

25

"Young likewise fails to plead any other reasonable strategy counsel should have utilized. Three key pieces of evidence presented by the State against Young were the testimony of Hammonds, Bates, and their identification of Young in the security video. To undercut the State's theory that Young was there and was one of the shooters, it was a reasonable strategy on counsel's part to undermine the testimony and credibility of Hammonds and Bates. Young does not specify any other coherent defense strategy counsel could have introduced during opening statements."

(C. 661-64.)

Young asserted bare allegations that counsel was deficient in his opening statement. In fact, his entire pleadings consist of what Young maintains counsel did wrong. Young failed to plead what a "coherent defense" or opening would have consisted of or what counsel should have stated in opening statement. Also, Young did not plead any facts indicating that there was an alternative defense involving an alibi.

"[The appellant] made bare and conclusory allegations that counsel failed to put forth a coherent defense theory and to challenge the State's case during opening and closing statements, but he failed to allege in his petition what he believed counsel should have said during opening and closing statements."

Stanley v. State, 335 So. 3d 1, 43 (Ala. Crim. App. 2020).

Moreover, opening statements are typically matters of trial strategy. "'[T]here is no constitutional rule that counsel must employ

26

any particular rhetorical technique in the opening statement.' <u>Cirincione v. State</u>, 119 Md. App. 471, 498, 705 A.2d 96, 108 (1998)." <u>Washington v. State</u>, 95 So. 3d 26, 65 (Ala. Crim. App. 2012).

In regard to Young's claim that his trial counsel failed to keep a promise made in opening, this Court has stated:

> "[N]umerous courts have held that counsel's failure to keep a promise made in opening statements rarely constitutes ineffective assistance of counsel. See <u>Hampton v. Leibach</u>, 290 F. Supp. 2d 905, 928 (N.D. Ill. 2001) ('An attorney's failure to fulfil promises made in opening statement is not often a successful basis for an ineffective assistance claim. The decision to change strategy during trial is often forced upon defense counsel by the vagaries of the courtroom arena.'); <u>United States ex rel. Johnson v. Johnson</u>, 531 F.2d 169, 177 n. 19 (3d Cir. 1976) ('We do not intimate ... that a lawyer of normal competence could not promise to produce evidence in this opening statement and then change his mind during the course of the trial and not produce the promised evidence.'). See also <u>Fayemi v. Ruskin</u>, 966 F.3d 591, 594 (7th Cir. 2020) ('[T]he Supreme Court has never hinted at a per se rule that defense lawyers must keep all promises made in opening statement, even if a mid-trial change in circumstances alters the defense strategy.')."

<u>State v. Lewis</u>, [Ms. CR-20-0372, May 6. 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022).

Based on the cases cited above, we agree with the postconviction court that there was no material issue of fact or law that would have entitled Young to relief on this claim.  Summary dismissal was proper.

27

See Rule 32.7(d), Ala. R. Crim. P. For these reasons, Young is due no relief on this claim.

2.

Young next argues that his trial counsel failed to adequately cross-examine key State witnesses.

> "'[D]ecisions regarding whether and how to conduct cross-examinations and what evidence to introduce are matters of trial strategy and tactics.' Rose v. State, 258 Ga. App. 232, 236, 573 S.E.2d 465, 469 (2002). '"[D]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature.'"' Hunt v. State, 940 So. 2d 1041, 1065 (Ala. Crim. App. 2005), quoting Rosario–Dominguez v. United States, 353 F. Supp. 2d 500, 515 (S.D.N.Y. 2005), quoting in turn, United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). 'The decision whether to cross-examine a witness is [a] matter of trial strategy.' People v. Leeper, 317 Ill. App. 3d 475, 483, 740 N.E.2d 32, 39, 251 Ill. Dec. 202, 209 (2000)."

A.G. v. State, 989 So. 2d 1167, 1173 (Ala. Crim. App. 2007).

To sufficiently plead a claim that counsel was ineffective in cross-examination of a witness, or lack of cross-examination, a Rule 32 petitioner must plead what "questions would have resulted" in an adequate cross-examination and further "plead any facts indicating that counsel's decision not to cross-examine [the witness] was not sound trial strategy." A.G. v. State, 989 So. 2d at 1173.

a.

Young first asserts that his trial counsel was ineffective in its cross-examination of Hammonds because, he says, counsel failed to cross-examine Hammonds concerning the inconsistencies in his multiple statements to police, his plans to lie to authorities, and his plan with Bates to set up Freeman and Blythe. Young further pleaded that counsel was ineffective for playing Hammonds's videotaped statement to the jury.

When summarily dismissing this claim, the postconviction court stated:

> "The jury certainly heard Hammonds's admission and was therefore aware that he had lied to police. Moreover, trial counsel was able to remind the jury of that fact during closing arguments. Similarly, counsel made sure that the jury saw Hammonds's videotaped statement, which showed his demeanor, his pleas for leniency, and his shifting statements.
>
> "....
>
> "Young next claims that counsel were ineffective for failing to cross-examine Hammonds about his initial plan with Bates to lie to authorities. …
>
> "Young fails to satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. As for the coverup effort by Bates and Hammonds, Young fails to plead how such testimony would have made a difference in his trial, especially considering that Hammonds had already admitted to lying to the police, he testified that he had lied at Bates's request, and

29

he testified that he and Bates had spoken about lying to police. Moreover, Young fails to plead how Hammonds's answers would have saved Young from conviction when they did not save Hubbard from conviction of capital murder. ...

"....

"Young next claims that counsel was ineffective for failing to ask Hammonds about his plan with Vickery to set up Freeman and Blythe.

"As addressed above, Young fails to state a valid claim for relief or present a material issue of fact or law under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. Testimony from Vickery that Hammonds targeted Blythe and Freeman would have been cumulative to the testimony presented at trial. Bates and Hubbard both testified that Freeman was targeted and marked for death. Further, Hammonds testified that he contacted Freeman directly as part of the plan to set him up. ...

"Finally, Young claims that introducing Hammonds's videotaped statement was ineffective. ... Young's claim focuses entirely on the alleged negative impact of trial counsel's strategic decision to play the videotape of Hammonds's statement and entirely fails to account for the positive ways in which trial counsel made use of it. As discussed above, trial counsel was able to reference Young's statement during closing arguments to point out Young's inconsistencies, pleas for leniency, and his consistent preoccupation with avoiding arrest. Counsel made use of that evidence to portray Hammonds as a liar who would say anything to stay out of prison. Considering how counsel actually used this evidence, Young fails to explain why trial counsel's decision to play the video was not a matter of sound trial strategy. Similarly Young fails to plead facts showing that the benefits of the videotape were outweighed by the disadvantages of doing so. Thus, Young has failed to plead

30

facts that, if true, would establish either <u>Strickland [v. Washington</u>, 466 U.S. 668 (1984),] prong."

(C. 666-72.)

Young failed to plead what counsel should have asked on cross-examination and did not plead any facts that suggested that counsel's actions were not strategic. <u>A.G. v. State</u>, 989 So. 2d at 1173. Summary dismissal of this claim was proper.

Moreover, the trial record shows that the State questioned Hammonds about his first statement to police and that Hammonds admitted that he had lied to police. (Trial R. 836.) The State also elicited testimony from Hammonds that Bates had asked him to lie. The cross-examination by defense counsel shows that counsel chose to concentrate on the fact that, of the individuals involved in the shooting, Hammonds was the only one that had not been charged with any offense, and that, he thus had a great motivation to lie at Young's trial. (Trial R. 841.)

Also, trial counsel's decision to play Hammonds's videotaped statement to the jury was clearly a strategic decision. The jurors could see for themselves by viewing the tape and viewing Hammonds's trial testimony that he had lied to police. Thus, there was also no material

31

issue or fact or law that would entitle Young to relief. See Rule 32.7(d), Ala. R. Crim. P. Accordingly, Young is due no relief on this claim.

b.

Young next argues that his trial counsel was ineffective for failing to adequately cross-examine Bates. Specifically, he pleaded that trial counsel should have cross-examined Bates concerning the terms of his plea agreement with the State and should have questioned him about his inconsistent statements to police.

In summarily dismissing this claim, the postconviction court stated:

"Young does not plead how counsel could have discredited Bates with further questioning. Indeed, Young does not specify a single question counsel should have asked to discredit Bates, Bates's response, or how Bates's response would have further discredited him. Moreover, Young fails to plead how counsel's alleged failures actually prejudiced him, especially considering that, since the jury watched the same video, it could determine the quality of the video and give Bates's identification of Young its due weight. Thus, Young has failed to plead facts, that, if true, would establish either Strickland [v. Washington, 466 U.S. 668 (1984),] prong. …

"Young next claims that counsel failed to question Bates about the inconsistencies between his first and second statements to law enforcement. Young claims that if counsel had questioned Bates about his inconsistent statements to police, the jury would have learned that Bates and Hammonds were the only two in the gang that knew Freeman and Blythe, and that Hammonds and Hubbard had engineered the shooting.

32

"...This testimony would have been cumulative at best, as Bates had already testified on direct that none of the people involved in the shooting, other than himself and Hammonds, knew Freeman. Bates had already testified on direct that Hammonds and Hubbard engineered the shooting, and that it was Bates's job to set Freeman up for the shooting. Bates had likewise already testified on direct that, during his first meeting with police, he told officers that he was at the shooting.

"....

"Young next claims that counsel failed to adequately cross-examine Bates about his plan with Hammonds to concoct a story to police, which Young claims would have made Hammonds look just as culpable and devious.

"...Young's claim hinges on the assumption that Bates would have given a different answer to defense counsel than he gave on direct. But Young fails to plead facts showing that Bates would have given a different response. ...

"...Young's specific contention that the jury would have known that Bates's proffer agreement and plea deal were in evidence without defense counsel's guidance is meritless, as the jury had the ability to review all pieces of evidence presented at trial. Though defense counsel did not publish the deal and agreement to the jury, counsel did introduce them into evidence, and, thus, they were available to the jury during deliberations. Moreover, during closing arguments, defense counsel pointed out to the jury that Bates had lied to the police, and the jury heard Bates give this testimony on direct. Young fails to specify any other particular lie counsel should have chosen to highlight during closing, or why counsel's decision to address the lies collectively was unreasonable. Moreover, Young fails to plead how counsel's strategy actually prejudiced him. Thus, Young has failed to

33

plead facts that, if true, would establish either <u>Strickland</u> prong."

(C. 672-77.)

Young failed to plead what counsel should have asked Bates on cross-examination; thus, we agree with the postconviction court that Young failed to plead the full facts necessary to survive summary dismissal on this claim. See Rule 32.6(b), Ala. R. Crim. P.

Moreover, the trial record shows that before Bates testified a lengthy hearing was held outside the presence of the jury. Young's counsel moved to suppress Bates's testimony. The trial court noted that it had granted Young's motion to suppress all statements that Bates made on July 7, 2017. On voir dire and outside the presence of the jury, Young's counsel then questioned Bates about the specific terms of his plea agreement with the State, and the facts and introduced that agreement. (Trial R. 712-17.) When the jury was brought back into the courtroom, the prosecutor questioned Bates extensively about the terms of his plea agreement with the State, that he had pleaded guilty to conspiracy to commit murder, that he was currently incarcerated in Colbert County jail, and that he had an agreement with the State that in exchange for his truthful testimony the State would recommend a

34

sentence of 20 years. (Trial R. 722-24.) The jury was aware of the terms of the State's plea agreement with Bates; therefore, any further discussion on that subject would have been repetitive. The record also shows that the State questioned Bates about his statement to police and that Bates testified that he lied to police and that he had asked Hammonds to lie for him. On cross-examination counsel questioned Bates concerning his ability to identify Young from the video given the condition of the videotape.

The trial record shows that the issues Young pleaded were not presented to the jury were, in fact, presented to the jury. Thus, summary dismissal of this claim was also proper because it failed to present an issue of fact or law that would entitle Young to relief. See Rule 32.7(d), Ala. R. Crim. P. Accordingly, Young is due no relief on this claim.

c.

Young next argues that his trial counsel was ineffective for failing to adequately cross-examine Megan Bryant about Young's drug use on the day of Freeman's murder.[4] Specifically, he asserts that counsel

---

[4]In Young's postconviction petition, this witness's name is spelled "Megan"; in the trial transcript her name is spelled "Meagan."

35

should have questioned Bryant about the fact that Young took drugs throughout the day and was intoxicated at the time of the shooting. Young further asserts that counsel should have questioned Bryant about her losing custody of her child and whether the State had indicated it was going to help her regain custody.

The postconviction court made the following findings on this claim:

"Young fails to plead how counsel's decision not to question Bryant on Young's drug use was not a matter of sound trial strategy. The jury had already heard testimony that the gang was involved in the drug trade. By refraining from asking Bryant questions about Young's drug use, the jury did not hear testimony, offered by Young's own defense team, that could have tainted their opinion of Young. In the same vein, had counsel questioned Bryant on her breakup with Young, Bryant might have testified, as Young acknowledges, that Young had cheated on her, or, at the very least appeared to be straying from their relationship. This information could have painted Young as a dishonest person, which in turn, could have tainted the jury's opinion of him. Young fails to plead why no reasonable attorney in counsel's position would have done the same. …

"Furthermore, Young claims there were indications that Bryant lost custody of her child, but Young does not provide any information in support of this contention. Young fails to plead on what days she lost her child, in what county, and for what reason Bryant lost custody of her child. Young likewise fails to plead facts that, if true, would establish that Bryant could not regain custody of her child without cooperating with law enforcement and the District Attorney's Office. Thus, Young fails to plead facts that, if true, would establish either Strickland [v. Washington, 466 U.S. 668 (1984)] prong."

36

(C. 677-80.)

Young failed to plead the full facts in regard to this claim. Young made a bare assertion that counsel did not question Bryant about Young's drug use but failed to plead any facts surrounding his supposed drug use on the day of the shootings. Nor did Young plead any facts surrounding his assertion that the State was going to assist Bryant with her child-custody problems.

A review of the trial record shows that defense counsel extensively cross-examined Bryant about her drug use on the day of the shootings in a clear effort to discredit her testimony:

"[Defense counsel]: Now, what was it that you were taking?

"[Bryant]: To start, I smoked weed, I took Xanax. In the evening time, I have a prescription for Remeron, Prednisone, and Ambien that I would take.

"....

"[Defense counsel]: And just tell us what all you did the rest of the day. What all drugs did you do that day?

"[Bryant]: I mean, I can't exactly be sure what all drugs I took that day. I had a very deep addiction and would take anything that I could get my hands on.

"....

37

"[Defense counsel]: That is your testimony that all of the things that you just testified under oath that you said and did, heard other folks did, you were high off of drugs when that happened; is that correct?

"[Bryant]: Yes, sir."

(Trial R. 900-902.)

Counsel's cross-examination of Bryant was both thorough and extensive. Clearly, counsel chose to focus on the fact that Bryant had taken many drugs on that day and, thus, that her testimony was suspect. "'"[T]he scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel."'" Stanley v. State, 335 So. 3d 1, 37 (Ala. Crim. App. 2020), quoting Bonner v. State, 308 Ga. App. 827, 828, 709 S.E.2d 358, 360 (2011), quoting in turn Cooper v. State, 281 Ga. 760, 762, 642 S.E.2d 817, 820 (2007).

For the above reasons, this claim was properly summarily dismissed, and Young is due no relief.

d.

Young next argues that his trial counsel was ineffective for failing to adequately cross-examine Shaun Settles because, he says, Settles was

38

in possession of critical evidence, a note/letter, indicating that Young was being used as a scapegoat.[5]

Settles testified that he was in jail on unrelated charges at the same time as Capote and Hubbard, that Hubbard was his cell mate, and that Capote was in a nearby cell. He said that Capote and Hubbard would pass notes between the two cells and he would hand the notes between the two men. Settles said that he kept the notes. In one note, Capote wrote: "Listen gee I killed that nigga but f___ [Young] I'll ask for immunity if I tell him who killed [Freeman] and tell him [Young] did it." (C. 36.) Through the contact with Capote and Hubbard and the notes, Settles led police to the location of the SKS rifle that had been used to kill Freeman.

In finding that this claim failed to state a material issue of fact or law that would entitle Young to relief, the postconviction court stated:

> "While the letter certainly implicates Capote as one of Freeman's killers, it does not exonerate Young. Indeed, the State traveled under an accomplice liability theory for Young, as it was Capote's SKS bullets that killed Freeman. Just because Capote admits to killing Freeman in this letter does not prove that Young was not also there shooting right alongside Capote.

---

[5]In Young's postconviction petition, this witness's name is spelled "Shaun"; in the trial transcript his name is spelled "Shawn."

"…Young claims that if counsel had introduced this evidence, the jury would have had proof that members of the conspiracy sought to make Young a scapegoat. On its face, the letter does not state that Capote would 'frame' Young, nor is there any indication that Capote would have needed to lie to place Young at the scene. Young fails to plead, then, how counsel's failure to introduce the letter, and then cross Settles on it was not part of a reasonable trial strategy. On direct, Settles gave limited testimony, briefly explaining that, from the letters between Capote and Hubbard, he learned the location of the SKS rifle Capote used to shoot Freeman. This information was then used by law enforcement to retrieve the rifle. This testimony is exceedingly narrow, and if anything, only further implicated Capote, not Young. If counsel had introduced the letter and crossed Settles on its contents, counsel could have opened-up Young to damaging testimony from Settles on cross and on re-direct. Thus, Young fails to plead facts that, if true, would establish either Strickland [v. Washington, 466 U.S. 668 (1984),] prong."

(C. 680-82.)

As the postconviction court stated, the note did not establish Young's innocence. The State maintained throughout the proceedings that two shooters were involved and that the fatal shot was fired from the SKS rifle that had been fired by Capote. It is also clear that counsel was given a copy of this note during discovery. Clearly, counsel made a strategic decision to not present the note. Accordingly, there was no material issue of fact or law that would entitle Young to relief under

40

Strickland. See Rule 32.7(d), Ala. R. Crim. P. Thus, summary dismissal of this claim was proper.

e.

Young next argues that his trial counsel was ineffective in its cross-examination of Investigator Wes Holland because, he says, counsel failed to adequately question him about the unreliability of the surveillance video of the parking lot where the shooting occurred.

The postconviction court stated the following:

"Young fails to plead how a reasonable attorney in counsel's position would have continued to question Investigator [Wes] Holland about the video's quality despite the already favorable testimony he gave on re-cross. Indeed, on re-cross, Investigator Holland testified that he could not tell if the persons in the video were black or white. Thus, counsel established the difficulty in making an identification from the video. Moreover, Young fails to plead how counsel's failure to further question Investigator Holland actually prejudiced him. Thus, Young has failed to plead facts that, if true, would establish either Strickland [v. Washington, 466 U.S. 668 (1984),] prong."

(C. 682-83.)

The trial record shows that the surveillance videotape was played to the jury. On re-cross, Holland was asked about whether he could tell from the tape if the driver of the vehicle was black or white. Holland indicated that he could not. (Trial R. 704.) Clearly, the jury could make

41

its own assessment concerning the reliability of the video as it viewed that video. There was no material issue of fact or law that would entitle Young to relief under Strickland. See Rule 32.7(d), Ala. R. Crim. P. Thus, summary dismissal was proper, and Young is due no relief on this claim.

3.

Young next argues that counsel was ineffective for failing to present an adequate closing argument. Specifically, he asserts that in closing argument trial counsel conceded that Young was guilty of capital murder.

The postconviction court found that this issue was not supported by the record and that Young thus was not entitled to relief. (C. 683.)

Indeed, the trial record shows that during closing argument defense counsel stated that based on the burden of proof in a civil case the evidence might point to Young's guilt but that this was a criminal case and the burden of proof required proof beyond a reasonable doubt. (Trial R. 1274.) Counsel did not concede Young's guilt in closing argument; therefore, this claim is not supported by the record. Accordingly, there was no material issue of fact or law that would entitle Young to relief. See Rule 32.7(d), Ala. R. Crim. P.

Moreover,

42

"'[c]losing argument is an area where trial strategy is most evident.' Flemming v. State, 949 S.W.2d 876, 881 (Tex. Ct. App. 1997). '[S]pecial deference is due to an attorney's closing argument strategy because it is 'an inherently subjective task.''' Johnson v. State, 612 So. 2d 1288, 1299 (Ala. Crim. App. 1992) (quoting Thompson v. Wainwright, 787 F.2d 1447, 1455 (11th Cir. 1986)."

Clark v. State, 196 So. 3d 285, 315 (Ala. Crim. App. 2015). For these reasons, Young is due no relief on this claim.

C.

Young next argues that his trial counsel was ineffective for not challenging evidence presented by the State indicating that Young was a high-ranking gang member involved in the narcotics trade.

The postconviction court stated: "The Court of Criminal Appeals addressed this issue on direct appeal and found 'no error, much less plain error, in the circuit court's admission of evidence of Young's gang affiliation.' Counsel cannot be ineffective for failing to raise a meritless objection." (C. 684.)

In this Court's opinion on direct appeal, we held that evidence of Young's gang affiliation and position in the gang was admissible and relevant to the circumstances surrounding the murder. We stated:

"The evidence at trial showed that Young was a member of the Almighty Imperial Gangsters. Although Young was a

43

top-ranking member of the gang, Hubbard was the leader of the gang and was above Young in the hierarchy. After Hubbard's house was burglarized, Hubbard had a 'business discussion' with the members and told them that he wanted to find and kill the person who broke into his house. (R. 744.) He asked the gang for their help. This meeting, which Young attended, took place in Hubbard's bedroom, where, according to testimony, Hubbard generally conducted gang-related business. When Hammonds told Hubbard that Freeman might be the person who broke into Hubbard's house, Hubbard and the other members of the gang planned to kill Freeman. This evidence of Young's gang affiliation -- and especially his rank in the gang below Hubbard -- was relevant to show Young's motive for participating in killing Freeman at Hubbard's behest."

Young, ___ So. 3d at ___. Therefore, the underlying claim that supported

Young's claim of ineffective assistance of counsel had no merit.

"'[B]ecause the underlying claims have no merit, the fact that [the petitioner's] lawyer did not raise those claims cannot have resulted in any prejudice to [the petitioner].' Magwood v. State, 689 So. 2d 959, 974 (Ala. Crim. App. 1996). See also Commonwealth v. Walker, 613 Pa. 601, 614, 36 A.3d 1, 9 (2011) ('Since all of appellant's underlying claims of trial counsel's ineffectiveness fail, his claims of appellate counsel's ineffectiveness are necessarily defeated as well....'); Jackson v. State, 133 So. 3d 420, 453 (Ala. Crim. App. 2009). Many other states have applied this same standard. See Walker v. State, 863 So. 2d 1, 11 (Miss. 2003) ('Because we have held that the underlying claims are without merit, Walker cannot show the requisite deficient performance and resulting prejudice necessary to establish the various claims of ineffective assistance of counsel.'); People v. Pitsonbarger, 205 Ill. 2d 444, 466, 275 Ill. Dec. 838, 854, 793 N.E.2d 609, 625 (2002) ('Claims of ineffective assistance of counsel at trial and on direct appeal are evaluated under the standard set forth in

44

Strickland [v. Washington,] 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693 [(1984)], which requires the defendant to demonstrate both deficient performance by counsel and resulting prejudice. Accordingly, if the underlying claim has no merit, no prejudice resulted, and petitioner's claims of ineffective assistance of counsel at trial and on direct appeal must fail.')."

White v. State, 343 So. 3d 1150, 1174 (Ala. Crim. App. 2019). For these reasons, Young is due no relief on this claim.

## D.

Young next argues that his trial counsel was ineffective for failing to object to the admission of "unreliable videotape evidence without a proper foundation." (Young's brief, p. 80.) Specifically, Young pleaded that counsel should have objected when the videotape made by surveillance cameras of the parking lot where the shooting occurred was introduced and admitted into evidence.

The postconviction court found that, on direct appeal, this Court addressed the underlying issue and found no error, much less plain error; therefore, there was no material issue or fact or law that would entitle Young to relief. (C. 690.) In this Court's opinion on direct appeal, we held that the videotape was admissible under the "silent witness theory"

because the State had satisfied the requirements of Voudrie v. State, 387 So. 2d 248 (Ala. Crim. App. 1980). See Young, ___ So. 3d at ___.[6]

The trial record shows that the State called Mary Sumerel, the property manager at Spring Creek Apartments, as a witness to establish the foundation for the admission of the videotape. Sumerel testified that the apartment complex had video surveillance cameras and that the cameras were working at the time of the shootings. (Trial R. 530.) She testified as to when those video cameras were installed, that the video was stored on a flash drive, and that the video of the shooting had not been altered in any way while it was in her possession. (Trial R. 534.) Sumerel's testimony was sufficient to establish a proper foundation for the admission of the videotape. This Court in Capote specifically found that the same video was admissible against a claim that there had not been a proper foundation for its admittance.[7] See Capote v. State, 323 So. 3d at 131. Also, the poor quality of the video did not affect its

---

[6]See Ex parte Fuller, 620 So. 2d 675 (Ala. 1993), recognizing the modified Voudrie test.

[7]Sumerel's testimony in Capote's trial was very similar to her testimony at Young's trial.

admissibility but rather its weight. "The quality of the tape was a factor for the jury's consideration in determining the weight to be given the evidence, rather than a factor concerning its admissibility." Davis v. State, 529 So. 2d 1070, 1072 (Ala. Crim. App. 1988).

Because the underlying claim had no merit, summary dismissal was proper. See White, supra. For these reasons, Young is due no relief on this claim.

### E.

Young next argues that his trial counsel was ineffective for failing to adequately challenge the admission of evidence of Young's DNA that had been discovered on a soda can in the white pickup involved in the shooting. In summarily dismissing this claim, the postconviction court stated:

> "Young claims that trial counsel should have objected to the DNA evidence on relevance grounds. However, the presence of Young's DNA inside the vehicle driven by the shooters was clearly relevant and admissible because it tended to make it more likely that Young was present at the murder scene, creating a definite link between Young and the vehicle used to commit the crime. While Young makes much of the fact that the DNA evidence cannot pinpoint the time that he was present in the truck, that is nearly always the case with DNA evidence and it would not have been grounds for error. …
> "....

47

"Moreover, Young fails to satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. Young fails to specifically plead any arguments, or authority, that trial counsel could have relied on to further challenge the admissibility of DNA evidence."

(C. 691-93.)

First, this claim was properly dismissed because Young pleaded no grounds upon which the DNA evidence should have been challenged by his trial counsel. Young failed to plead the full facts to support this claim. See Rule 32.6(b), Ala. R. Crim. P.

Moreover, Angela Fletcher, a forensic biologist with the Alabama Department of Forensic Sciences, testified that she conducted DNA tests on several items that were discovered in the truck involved in the shootings. The DNA on the soda can, she said, was consistent with Young's DNA. Also, DNA from a cigarette butt was consistent with Capote's DNA. On cross-examination, counsel questioned Fletcher about transferring DNA by coughing or sneezing, made the point that there was no way to determine how long the DNA had been present, and indicated that the soda can that contained the DNA could have been moved from another location and placed in the truck. (Trial R. 1075.) The record shows that counsel did question the DNA expert. Thus, this claim also

48

presented no issue of fact or law that would entitle Young to relief.  Thus,

Young is due no relief on this claim.

F.

Young next argues that his trial counsel was ineffective for failing

to object to various items of evidence that, he says, were inadmissible.

> "'[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made. Effectiveness of counsel is not measured by whether counsel objected to every question and moved to strike every answer.' Brooks v. State, 456 So. 2d 1142, 1145 (Ala. Crim. App. 1984). As we recently stated in Hooks v. State, 21 So. 3d 772 (Ala. Crim. App. 2008):
>
>> "'"'Decisions concerning whether or when to make objections at trial are left to the judgment of counsel.' State v. Suarez, 867 S.W.2d 583, 587 (Mo. App. 1993). 'Ineffective assistance of counsel is not to be determined by a post-trial academic determination that counsel could have successfully objected to evidence in a given number of instances.' Id. 'The failure to object to objectionable evidence does not establish ineffective assistance of counsel unless the evidence resulted in a substantial deprivation of the accused['s] right to a fair trial.' Id. 'Counsel's failure to object to particular evidence can constitute mere "trial error" not arising to constitutional proportions and thus not cognizable in a post-conviction motion.' Id."'
>
> "Quoting State v. Radley, 904 S.W.2d 520, 525 (Mo. App. 1995)."

49

Bush v. State, 92 So. 3d 121, 161 (Ala. Crim. App. 2009).

1.

First, Young argues that his trial counsel failed to object to a photograph that was admitted in the guilt phase that showed the victim and his girlfriend because, he says, the photograph constituted inadmissible victim-impact evidence.

In finding that Young failed to plead sufficient facts to support this claim, the postconviction court stated:

> "Young does not explain how this picture was improper victim impact evidence. Young fails to plead why no reasonable attorney would have failed to object to this picture. Moreover, Young completely fails to plead how counsel's actions prejudiced him. Indeed, Young makes a conclusory allegation that counsel's actions were deficient, but does not explain how, had counsel objected, the outcome of his trial would have likely been different. Thus, Young fails to plead facts that, if true, would establish either Strickland [v. Washington, 466 U.S. 668 (1984),] prong."

(C. 694.)

Moreover, "[v]ictim-impact statements typically 'describe the effect of the crime on the victim and his family.'" Turner v. State, 924 So. 2d 737, 770 (Ala. Crim. App. 2002).

> "As for Brooks's claim that his counsel were ineffective for failing to object to the picture of Brett in a karate uniform and a picture of Forest and Brett together, as explained above, 'it is generally agreed that the photograph of the victim of the

50

homicide, taken before the alleged murder, is admissible for the purpose of identification.' Russell [v. State,] 272 So. 3d [1134] 1165 [(Ala. Crim. App. 2017)] (citations and quotations omitted). Thus, Brooks's counsel were not ineffective for failing to object to the admission of those photographs as victim-impact evidence."

Brooks v. State, 340 So. 3d 410, 465 (Ala. Crim. App. 2020).

"[A]t least one court has noted the rarity of finding a counsel's performance ineffective for failing to object to photographs:

"'A competent lawyer familiar with the most recent pronouncements of this Court on the subject and familiar with the trial record would not perceive that admission of the photographs was an obvious basis for reversal of the appeal. No case is cited or found where trial counsel was held ineffective for failing to object to such photographs or holding that appellate counsel was ineffective for not asserting error in the admission of such photographs."'

Thompson v. State, 310 So. 3d 850, 874 (Ala. Crim. App. 2018), quoting Hall v. State, 16 S.W.3d 582, 587 (Mo. 2000). There was no material issue or fact or law that would entitle Young to relief. See Rule 32.7(d), Ala. R. Crim. P. Accordingly, summary dismissal was proper, and Young is due no relief on this claim.

### 2.

Young next argues that his trial counsel was ineffective for failing to object to a hearsay statement made by a police officer that Young was

"possibly armed with a rifle" when he was arrested. (Young's brief at p. 83.)

In summarily dismissing this claim, the postconviction court stated:

"This statement was not hearsay as it was not an out of court statement offered to prove the truth of the matter asserted. This statement was not offered to prove that Young was armed with a rifle, but rather, was offered to inform the jury of the officer's mindset when in pursuit of Young. ... Even if this statement was hearsay, Young fails to plead that it was not otherwise admissible. Young fails to plead how, if counsel had objected, there is a reasonable probability the entire outcome of his case would have been different. Thus, Young fails to plead facts that, if true, would establish either Strickland [v. Washington, 466 U.S. 668 (1984)] prong."

(C. 694-95.)

The trial record shows that Officer Derrick Thomas of the Loretto Police Department testified that on March 4, 2016, he was in pursuit of Young. The following occurred:

"[Prosecutor]: Can you tell the ladies and gentlemen of the jury what information you had about the pursuit or the subject involved in the pursuit at that point?

"[Officer Thomas]: We were monitoring the pursuit coming into Lauderdale County. Our radios allow us to monitor the Lauderdale County Sheriff's Department. From that, we learned that it was a silver Ford car. When it was apparent that it was coming into Lawrence County, their dispatch contacted ours and they relayed to us that Mr. Young was wanted for a homicide in Tuscumbia and was possibly armed with a rifle."

52

(Trial R. 960-61.)

Clearly, the above evidence was introduced to show the circumstances surrounding Young's arrest and was not hearsay.

> "'"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' Rule 801(c), Ala. R. Evid. However, '"[a] statement offered for some other purpose other than to prove the truth of its factual assertion is not hearsay."' Montgomery v. State, 781 So. 2d 1007, 1019 (Ala. Crim. App. 2000) (quoting Thomas v. State, 408 So. 2d 562, 564 (Ala. Crim. App. 1981))."

Capote v. State, 323 So. 3d 104, 127 (Ala. Crim. App. 2020).

Accordingly, any objection that this evidence was hearsay would have been overruled. "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." Lee v. State, 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009). Summary dismissal was proper, and Young is due no relief on this claim.

### 3.

Young next argues that his trial counsel was ineffective for failing to object to testimony from Officer Steven Benson concerning the apprehension of Young's codefendants, Capote and Hubbard, at a traffic

stop. Young's entire argument on this issue in brief consists of the following statement: "As Mr. Young also pleaded, counsel also failed to object to irrelevant and inadmissible testimony from Steven Benson concerning the apprehension of both Capote and Hubbard in a traffic stop." (Young's brief at pp. 83-84.)

In finding that Young failed to plead sufficient facts to support this claim, the postconviction court stated:

> "Young makes a conclusory claim that this testimony was not relevant or admissible, but he fails to explain how. Young fails to plead how this was not part of a reasonable trial strategy. The testimony presented no harm to Young as it did not implicate him in any illegal activity. Rather, the testimony distanced Young from Capote and Hubbard as Young was not with the pair when they were arrested. Moreover, Young completely fails to explain how he was actually prejudiced."

(C. 696.)

Young failed to plead why the testimony concerning the arrest of two of his codefendants was irrelevant and inadmissible. Nor did he plead how he was prejudiced by the officer's testimony. Accordingly, Young failed to meet his burden of pleading the full facts in regard to this claim and summary dismissal was proper. Rule 32.6(b), Ala. R. Crim. P. Accordingly, Young is due no relief on this claim.

4.

Young further argues that his trial counsel was ineffective for failing to object to the introduction of 34 autopsy photographs of the victim because, he says, the photographs were prejudicial.

The postconviction court found that this claim was without merit because this Court, on direct appeal, addressed the admissibility of the autopsy photographs and held that the photographs were admissible. (C. 697.) On direct appeal, we stated:

> "Although unpleasant to view, the autopsy photographs were relevant and admissible to show the location and the extent of the wounds to Freeman's body. The State had the burden of proving beyond a reasonable doubt that Young intended to kill Freeman 'by or through the use of a deadly weapon while the victim is in a vehicle.' § 13A-5-40(17), Ala. Code 1975. Among other things, the photographs showed the number and the location of the gunshot wounds to Freeman's body. Thus, the photographs were relevant to show Young's intent that Freeman be killed and to show that Freeman was seated in his vehicle when he was shot. We also note that the photographs of the injured vital organs showed 'only so much of the surrounding dissected body area' as was 'reasonably necessary to furnish visual aid to the jury.' See McKee v. State, 33 Ala. App. 171, 177, 31 So. 2d 656, 661 (1947). For these reasons, we find no error, much less plain error, in the admission of the autopsy photographs."

Young, ___ So. 3d at ___.

When addressing the admission of the same photographs in the trial of one of Young's codefendants, this Court further stated:

"This Court has thoroughly reviewed all the autopsy photographs. As Capote contends, photographs that depict distortions of the subject matter, such as massive mutilation or extreme magnification, are objectionable. See Malone v. State, 536 So. 2d 123 (Ala. Crim. App. 1988). Nonetheless, photographs that accurately depict the nature of a victim's wounds are admissible even if they are gruesome or cumulative. Acklin v. State, 790 So. 2d 975 (Ala. Crim. App. 2000). The autopsy photographs were relevant and admissible to show the extent of the wounds to Freeman's body. Each photograph was identified and explained to the jury. Although they are certainly unpleasant to view, they are not unduly gruesome, and this Court concludes that their prejudicial effect did not substantially outweigh their probative value. Therefore, this Court finds no error, much less plain error, in the admission of the autopsy photographs. Accordingly, Capote is not entitled to any relief on this claim."

Capote v. State, 323 So. 3d at 126-27.

Counsel cannot be ineffective for failing to raise an issue that has no merit. Lee v. State, 44 So. 3d at 1173.

Moreover,

"At least one court has noted the rarity of finding a counsel's performance ineffective for failing to object to photographs:

"'A competent lawyer familiar with the most recent pronouncements of this Court on the subject and familiar with the trial record would not perceive that admission of the photographs was an obvious basis for reversal of the appeal. No case is

56

> cited or found where trial counsel was held ineffective for failing to object to such photographs or holding that appellate counsel was ineffective for not asserting error in the admission of such photographs.'"

Thompson v. State, 310 So. 3d 850, 874 (Ala. Crim. App. 2018), quoting, in part Hall v. State, 16 S.W.3d 582, 587 (Mo. 2000).  For these reasons, Young was due no relief on this claim and summary dismissal was proper.

## G.

Young next argues that his trial counsel was ineffective for failing to conduct any meaningful voir dire relevant to the unique issues presented by a death-penalty case.

In finding that Young failed to plead the full facts concerning this claim, the postconviction court stated:

> "Young claims that counsel asked 'basic' questions, but he fails to plead what questions counsel asked that were problematic.  Young likewise fails to specifically plead what questions counsel should have asked.  Finally, Young completely fails to plead how counsel's alleged failure actually prejudiced him, considering the State's own questions concerning the death penalty and the juror's answers.  Thus, Young fails to plead facts that, if true, would establish either Strickland [v. Washington, 466 U.S. 668 (1984),] prong."

(C. 697-98.)

57

As the postconviction court stated, Young failed to plead what questions counsel should have asked during voir dire that would have constituted more than "basic" questions.  Also, Young failed to plead how he was prejudiced by counsel's actions during voir dire.  Therefore, the full facts concerning this claim were not pleaded.  Rule 32.6(b), Ala. R. Crim. P.

Moreover, the trial record shows that the prospective jurors were death-qualified by the circuit court.  In fact, this claim was raised on direct appeal and this Court upheld the death-qualifications questions posed to the prospective jurors.  Young, ___ So. 3d at ___.  In regard to voir dire examination, this Court has stated:

> "'Generally, "[a]n attorney's actions during voir dire are considered to be matters of trial strategy," which "cannot be the basis" of an ineffective assistance claim "unless counsel's decision is ... so ill chosen that it permeates the entire trial with obvious unfairness."'

"Neill v. Gibson, 263 F.3d 1184, 1193 (10th Cir.2001) (quoting Nguyen v. Reynolds, 131 F.3d 1340, 1349 (10th Cir. 1997)). 'Counsel, like the trial court, is granted "particular deference" when conducting voir dire.' Keith v. Mitchell, 455 F.3d 662, 676 (6th Cir. 2006)."

<u>Washington v. State</u>, 95 So. 3d 26, 64 (Ala. Crim. App. 2012). For these reasons, summary dismissal of this claim was proper, and Young is due no relief on this claim.

H.

Young argues that two of his trial attorneys suffered from a conflict of interest because, he says, his attorney Ben Gardner represented Shaun Settles's girlfriend, Robyn Green, on an unrelated charge and another of his attorneys, Nathan Johnson, had previously represented Settles. Young also pleaded that his attorneys shared information with Hubbard's investigator.

This portion of Young's petition is confusing and sparse. Young pleaded that Shaun Settles testified in exchange for a lenient sentence in an unrelated case and for a more lenient sentence for Green in that same unrelated case. He further pleaded that Gardner had represented Settles's girlfriend and that at one point Johnson had represented Settles. Green did not testify at Young's trial.

In summarily dismissing this claim, the postconviction court stated:

"Young fails to satisfy the specificity and full factual pleading requirements of Rule 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. To establish a conflict-of-interest claim, a petition 'must establish that an actual

59

conflict of interest adversely affected his lawyer's performance …. Thus, the mere possibility of a conflict is not enough to upset a conviction; the [petitioner] must identify an actual conflict that impeded his lawyer's representation.' … Young has failed to do this. It is not enough to establish an actual conflict by simply stating that counsel also represented someone else who was tangentially connected to this case. Young likewise fails to plead how this 'conflict' impeded his representation, especially considering counsel's vigorous cross-examination of Settles. As for Young's claim that counsel shared information with Hubbard's investigator, Young fails to plead what information was shared and how such action, if true, prejudiced him. Indeed, Young does not plead how the information given to the investigator was used against him at trial and impacted its outcome. Rather, Young makes only a conclusory allegation that counsel erred. Thus, Young's claim as pleaded is insufficient to overcome Strickland's strong presumption of effective assistance."

(C. 699.)

Young failed to plead the full circumstances surrounding his attorneys' prior representations. Indeed, no facts concerning those representations were pleaded in Young's petition. Nor did Young plead what counsel supposedly shared with Hubbard's investigator. "Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis must be included in the petition itself." Hyde v. State, 950 So. 2d at 356.

Moreover, the trial record shows that before Settles testified, Young's counsel objected and argued that Settles's testimony should be

60

excluded because the State attorneys who signed the agreement with Settles would be called to testify. The trial record further shows that neither Gardner nor Johnson represented Settles when he signed the plea agreement. The plea agreement that was entered into evidence shows that at the time that the plea agreement was signed, Settles's attorneys were Jeff Austin and Pride Tompkins. (Trial C. 43-49.)

For these reasons, summary dismissal of this claim was proper. Accordingly, Young is due no relief on this claim.

## I.

Young next argues that his trial counsel was ineffective for failing to object to the State's lack of corroboration of his accomplices' testimony.

The postconviction court noted that this Court, on direct appeal, addressed the underlying claim and then found that, even if Young had objected, there was sufficient evidence to corroborate the testimony of his accomplices. On direct appeal, this Court held that the testimony of Hammonds and Bates was corroborated. We stated:

> "Even without Hammonds's and Bates's testimony of Young's involvement in the murder of Freeman and the shooting of Blythe, the State presented sufficient evidence tending to connect Young with those offenses.

61

"The State presented evidence that two days before Freeman was murdered Hubbard reported a burglary at his house on Midland Avenue in Muscle Shoals. The responding officer said that Hubbard was angry about the burglary, and Young's girlfriend, Meagan, testified that she and others had to calm down Hubbard. (R. 896.) Meagan testified that two days later she was at Hubbard's house when Young and several others went into Hubbard's bedroom. When Young came out of the bedroom 10-15 minutes later, he went with Meagan, Capote, and Capote's girlfriend to the Gander Mountain store in Florence. Young asked Meagan to buy some ammunition and he told her what kind of ammunition to buy. Meagan bought a box of 7.62x39mm ammunition from Gander Mountain at 9:01 p.m. on March 1. After Meagan bought the ammunition, Young drove everyone back to Hubbard's house.

"Surveillance footage from the Spring Creek Apartments in Tuscumbia shows a white Dodge four-door pickup truck arriving at the apartment complex around 10:47 p.m. on March 1. A blue Mustang arrived about 10-11 minutes later. The time stamps from the surveillance footage showing Freeman's blue Mustang arriving at the Spring Creek Apartments corresponded with the time stamps from Burgner's Facebook Messenger exchange with Freeman in which Freeman told her that he was 'getting my cash r[ight] n[ow]' that 'Vonte' owed him.

"[Jodi] Bohn, who lived at the Spring Creek Apartments, testified that she looked out of her apartment window and saw two men get out of a white Dodge pickup truck. The man who got out of the driver's side was 'big and heavy.' The record shows that Young is 6 feet 4 inches tall and weighed 270 pounds.

"Law-enforcement officers found several shell casings at the scene. The State produced evidence that the shell casings found at the scene were 7.62x39mm -- the same type of

ammunition Young directed Meagan to buy from Gander Mountain two hours before Freeman was murdered.

"Shortly after midnight, [Dale] Springer [a resident of the Chateau Orleans apartments] saw a white Dodge pickup truck park at the Chateau Orleans apartment complex in Muscle Shoals near Hubbard's house. He saw a silver or gold four-door car pull up. The driver of the pickup truck talked with the driver of the car before the car sped away. The two men who had gotten out of the pickup truck walked away and left the truck parked at the Chateau Orleans apartment complex.

"Meagan testified that when she woke up at Hubbard's house on March 2, Young 'thought it was best' that they leave Hubbard's house that day. Meagan testified that Young had in the past driven a white Dodge pickup truck. DNA from a grape soda can found in the white Dodge pickup truck parked at the Chateau Orleans apartment complex matched DNA from a cheek swab taken from Young.

"Three days after Freeman was murdered law-enforcement officers were watching Hubbard's house when they saw Young leave Hubbard's house driving a silver car. When law-enforcement officers tried to stop Young, Young led several law-enforcement agencies on a chase through northern Alabama and into Tennessee.

"Based on information Settles provided them, law-enforcement officers later found an SKS rifle matching the description of one that Hubbard owned. Forensic scientists tested the rifle and found that the 7.62x39mm-shell casings found at the scene, as well as the projectiles recovered from Freeman's body during the autopsy, were fired from the SKS rifle.

"The State's evidence, independent of Bates's and Hammonds's testimony, tended to connect Young to the

63

commission of the offenses for which the jury convicted him. Thus, the State produced sufficient evidence corroborating Bates's and Hammonds's accomplice testimony."

Young, ___ So. 3d at ___.

Because this Court addressed the underlying claim and concluded that there was sufficient evidence to corroborate Young's accomplices' testimony, there was no material issue of fact or law that would entitle Young to relief. See Rule 32.7(d), Ala. R. Crim. P. Therefore, summary dismissal was proper. For these reasons, Young is due no relief on this claim.

J.

Young next argues that his counsel was ineffective for failing to object to his conviction for shooting into a vehicle when that offense was part of the capital offense of shooting into an occupied vehicle. The postconviction court found that this claim was without merit based on the record. (C. 703.)

The trial record shows that Young was convicted of murder made capital because it was committed by shooting into an occupied vehicle, of assault in the first degree, and shooting or discharging-a-firearm into an occupied vehicle. (Trial C. 344.) However, before sentencing, the State

moved that the discharging a firearm conviction be set aside because, it argued, that crime was encompassed in the capital-murder conviction. (Trial C. 346-47.) The circuit court granted the State's motion. (Trial C. 348.) Thus, Young could not establish any prejudice in regard to this claim because the conviction was vacated. This issue presented no material issue of fact or law that would entitle Young to relief. See Rule 32.7(d), Ala. R. Crim. P. Therefore, Young is due no relief on this claim.

## K.

Young next argues that his trial counsel was ineffective for failing to pursue remedies when a juror indicated his fear of participating as a juror on Young's case. The pleadings on this claim consist of one paragraph. (C. 55.)

The postconviction court made the following findings:

"Though trial counsel moved for a mistrial, Young claims that if trial counsel had made an effort to gather more information from juror B.M., counsel could have presented a more 'coherent basis' for the motion being granted.

"....

"Young fails to plead what questions counsel should have asked, what answers juror B.M. would have given, and how those answers would have supported a motion for mistrial. … Without the above information, Young cannot

65

show that a mistrial was necessary to prevent 'manifest injustice.'

 "… Regardless of counsel's strategy, however, Young fails to plead how such decision actually prejudiced him. Thus, Young fails to plead facts that, if true, would overcome <u>Strickland's</u> strong presumptions. Such 'bare claims' are insufficient to warrant further proceedings. Rule 32.6(b), Ala. R. Crim. P."

(C. 703-706.)

The trial record shows that on the morning of the last day of trial, a matter was brought to the circuit court's attention. The following occurred:

"THE COURT: Let the record reflect that Juror [B.M.] and Bailiff Ernest Bechard, both just came in the courtroom.

"It is my understanding -- the Court's understanding that you noticed some suspicious activity in your neighborhood last night which made you uneasy and concerned you that there may be some relation to this case. You appropriately contacted the sheriff's department, which is absolutely what you should have done. And it is also the Court's understanding that the sheriff's office took your call seriously and investigated and dealt with your concern and your call. And at this time, I have asked the Sheriff to come in here and explain to you what was done in response to the conduct.

"....

"[Sheriff Williamson]: I didn't want to talk to you last night because I didn't want to be unethical or get in the way of these folks that have worked hard on this case. So what I wanted to talk to you about was, we checked this guy out, and you did

66

good by getting us a tag number. And what we think that --
we don't think it has anything to do with this case. We think
that it has to do with the break-ins that are going on out there
right now. So I just wanted you to feel at ease so that you
could do your job today."

(Trial R. 1349-51.) The circuit court then asked juror B.M. if the sheriff's comments had put his mind at ease. B.M. indicated that they did. (Trial R. 1351-52.) There is no indication that this juror was in fear because he was serving on Young's jury. This claim was not supported by the record and was properly summarily dismissed. See Rule 32.7(d), Ala. R. Crim. P. Accordingly, Young is due no relief on this claim.

## L.

Young next argues that his trial counsel was ineffective for failing to pursue "adequate remedies" when a juror slept through portions of the trial. The sparse pleadings on this claim consist of one paragraph. (C. 55.)

In summarily dismissing this claim, the postconviction court made the following findings:

"Young fails to satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. Young fails to plead why remedial measures were needed. Moreover, Young fails to plead what remedial measures counsel should have taken and on what grounds those requested remedial measures

67

would have been granted. Furthermore, Young fails to plead why a mistrial was necessary to prevent 'manifest injustice.' ... Young's claim amounts to 'counsel should have done something' -- but Young does not plead what counsel should have done. Finally, Young fails to plead how there is a reasonable possibility that, but-for counsel's failure, the outcome of his trial would have been different. Such 'bare claims' are insufficient to warrant further proceedings. Rule 32.6(b), Ala. R. Crim. P."

(C. 707.)

The record of Young's trial shows that the following occurred:

"[Defense counsel]: For the record, there's been a juror this morning, he's the gentlemen to your right on the front row. His eyes have been closed more than open. I wanted to note that for the record.

"THE COURT: Well, I just want to know, would you like to take any action or make any motion?

"[Defense counsel]: Not at this time, but after the break after lunch, we may be doing so."

(Trial R. 1050-51.)

First, Young pleaded that trial counsel should have moved for "remedial action." However, he failed to plead what he considered "remedial action." Nor did Young plead the identity of this juror. The full facts were not pleaded regarding this claim; thus, summary dismissal was proper. Rule 32.6(b), Ala. R. Crim. P.

68

Moreover, at least one court has held that not moving to replace a sleeping juror may be considered a sound strategic decision. The Utah Court of Appeals in State v. Marquina, 437 P. 3d 628, 638 (Utah App. 2018), stated:

> "[W]e must presume Marquina's defense counsel's conduct fell 'within the wide range of reasonable professional assistance.' [State v.] Calvert, 2017 UT App 212, ¶ 22, 407 P.3d 1098 [(2017)] (quotation simplified). Jury selection and retention are 'more art than science,' [State v.] Litherland, 2000 UT 76, ¶ 21, 12 P.3d 92 [(2000)], and Marquina's counsel was able to observe the jurors, including the alternate, over the course of three days. Everything from the jurors' demeanors to their reactions to testimony may have played a role in counsel's decision not to insist on replacing the sleepy juror. He may have simply preferred the jury he had. Even if this choice seems 'counterintuitive,' counsel may have reasonably thought that a sleepy juror would 'overcompensate' and would be reluctant to convict. See id. ¶ 22 (quotation simplified). Moreover, counsel's choices are viewed objectively; '[t]he first prong of the Strickland standard ... requires that a defendant rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy.' Id. ¶ 19 (emphasis added) (quotation simplified). ... Because Marquina has not demonstrated his counsel was objectively deficient, he has not established ineffective assistance of counsel."

State v. Marquina, 437 P.3d 628, 638 (Utah App. 2018). For the foregoing reasons, this claim was properly summarily dismissed. Therefore, Young is due no relief on this claim.

II.

Young next argues that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose exculpatory evidence. Specifically, he argues that the State failed to disclose the contents of Hammonds's cellular-telephone records and failed to disclose the plea agreement that it had with Robyn Green, Shaun Settles's girlfriend.

The postconviction court found that this claim was procedurally barred because it could have been raised at trial or on appeal but was not. Rule 32.2(a)(3) and Rule 32.2(a)(5), Ala. R. Crim. P.[8] The court also found that this claim was not sufficiently pleaded because Young failed to plead what the contents of Hammonds's cellular telephone would show and/or whether those contents were favorable to Young's case. He also failed to plead how the plea agreement with Green was suppressed, given that Young also pleaded that one of his attorneys, Ben Gardner, signed Green's plea agreement. (C. 757-59.)

---

[8]This Court has frequently held that a Brady claim may be procedurally barred in a postconviction proceeding. See Madison v. State, 999 So. 2d 561 (Ala. Crim. App. 2006); Hyde v. State, 950 So. 2d 344 (Ala. Crim. App. 2006); Duncan v. State, 925 So. 2d 245 (Ala. Crim. App. 2005); Barbour v. State, 903 So. 2d 858 (Ala. Crim. App. 2004).

In the postconviction petition, Young pleaded, in part:

"Hammond's phone and contents were critical to impeaching Hammonds at trial. Hammonds <u>likely</u> used this phone to coordinate the setup of Freeman and to contact De'Vontae Bates to concoct a fake story about their involvement in the case."

(C. 100.) (emphasis added). Young's entire pleadings on this claim are based on speculation. "'Speculation is not sufficient to satisfy a Rule 32 petitioner's burden of pleading.'" <u>Peraita v. State</u>, [Ms. CR-17-1025, August 6, 2021] ___ So. 3d ___, ___ (Ala. Crim. App. 2021), quoting <u>Mashburn v. State</u>, 148 So. 3d 1094, 1125 (Ala. Crim. App. 2013).

Moreover, "to sufficiently plead a <u>Brady [v. Maryland</u>, 373 U.S. 83 (1963)]; <u>Giglio [v. United States</u>, 405 U.S. 150 (1982)] claim, a petitioner must allege facts that, if true, would establish that the prosecution suppressed evidence that was favorable to the defendant and material." <u>Reynolds v. State</u>, 236 So. 3d 189, 201 (Ala. Crim. App. 2015). Young did not plead how Green's plea agreement was suppressed. As the postconviction court stated: "Young affirmatively acknowledges in his petition that trial counsel [Gardner] was aware of the plea agreement and had actually signed it. Considering these facts, it is clear on the face of the petition itself that no <u>Brady</u> suppression occurred." (C. 759.)

71

Thus, summary dismissal of this claim was proper, and Young is due no relief on this claim.

## III.

Young next argues that he was deprived of his right to a fair trial when juror W.F. failed to disclose during voir dire examination that he knew Investigator Wes Holland and Officer Stuart Setliff. He further argues that counsel was ineffective for failing to object when juror B.M. had contact with the Colbert County Sheriff's Office.

The postconviction court made the following findings on this claim:

"Young claims that W.F. knew Investigator [Wes] Holland and Officer [Stuart] Setliff but fails to plead how the three knew each other. Young fails to plead, for instance, if the three were friends or if the three had casually met. Young likewise fails to plead that W.F. purposefully withheld this information. Indeed, if W.F. had met the men briefly a few years ago, he may not have remembered meeting them. Moreover, Young claims that a new trial is warranted where the defendant 'might have been prejudiced,' but Young fails to plead how he might have been prejudiced. … It is not enough to plead that W.F. knew these officers -- Young must also plead how that fact, if true, might have actually prejudiced him. For these reasons, this claim is summarily dismissed.

"Young next claims that he was deprived of an impartial jury because of juror B.M.'s contact with the Colbert County Sheriff's Office.

"This claim fails to satisfy the specificity and full factual pleading requirements of Rules 32.3and 32.6(b) and it fails to

72

state a valid claim for relief or present a material issue of fact or law under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. After the guilt-phase verdict, juror B.M. contacted the Sheriff's Office about suspicious activity on his street that he was concerned was linked to Young's case. In a colloquy with the trial court, Sheriff Williamson said:

> "'I didn't want to talk to you last night because I didn't want to be unethical or get in the way of these folks that have worked hard on this case. So what I wanted to talk to you about was, we checked this guy out, and you did good by getting us a tag number. And … we don't think it has anything to do with this case. We think that it has to do with the break-ins that's going on out there right now. So I just wanted you to feel at ease that you could do your job today.'

"(R. 1351.) When the Court asked juror B.M. if 'the Sheriff's explanation put [his] mind at ease,' B.M. responded, 'correct.'

> "Young claims that the trial court improperly disallowed B.M. from saying anything further, and did not identify the deputies involved, the license plate number, and Sheriff Williamson's role. The trial court did not forbid B.M. from saying anything further, but rather, cautioned juror B.M. on his words. Young also claims that the trial court's statement was improper ex parte communication that was not fully or adequately disclosed to counsel. The claim is meritless on its face, as the attorneys were in the courtroom for this discussion. "

(C. 760-62.)

While Young pleaded the name of the juror who, he says, failed to disclose that he knew two officers, he pleaded no other facts as to how

W.F. supposedly knew the two police officers. Young failed to plead the full facts to support this claim. Rule 32.6(b), Ala. R. Crim. P.

Moreover, as noted above, juror B.M. had no improper contact with law enforcement. B.M. telephoned the police when there was a disturbance in his neighborhood late one night during the trial. There is absolutely nothing that suggests that that disturbance was related to Young's case. This claim presented no material issue of fact or law that would support relief. See Rule 32.7(d), Ala. R. Crim. P. Therefore, Young is due no relief on this claim.

Penalty-Phase Issues

IV.

Young next argues that he was deprived of the effective assistance of counsel at the penalty phase of his capital-murder trial.

To properly evaluate the claims pleaded by Young, we must consider the mitigation evidence that his counsel did present during the penalty-phase hearing. "'Although petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.'" Ray v. State, 80 So. 3d 965, 979 (Ala. Crim. App.

2011), quoting <u>Chandler v. United States</u>, 218 F. 3d 1305, 1320 (11th Cir. 2000).

At the penalty phase, defense counsel presented the testimony of Young's maternal aunt, Treena Sidebottom, and Dr. Carol Walker, a psychologist who evaluated Young and who had done extensive research into Young's background and upbringing.

Sidebottom testified at trial that her sister, Debra Louise Syesta,[9] was Young's mother, that her sister ran away when she was 16 years old because of the abuse in their household, that when Debra was pregnant with Young she was in jail, that when she gave birth to Young her father brought Debra and Young back to Florence, that Debra was an addict, and that Debra was frequently in trouble with law enforcement and was in and out of jail, and that Debra tried to commit suicide several times and that in one instance Young found her on the bathroom floor unresponsive and called for help. (Trial R. 1416.) When asked to described Young's home life, Sidebottom testified:

> "[B]efore Johnny Vandiver was in the picture, [Debra] was in government assistance and her home was always clean. [Young] was thriving and doing okay. They were struggling.

---

[9]In Young's postconviction proceedings his mother's name is spelled "Debra"; in the trial transcript her name is spelled "Deborah."

75

They didn't have a whole lot of money, but when I would go over there things -- things appeared to be okay.

"But when Johnny Vandiver came into the picture, that's when they got kicked out of the Section 8 or government assistance, and that's when I started noticing -- they moved from government assistance and Section 8 house, and then they moved into another house. And they moved in, and it was just dirty. And I asked [Debra] if I could help her clean, and she said no. But basically they just moved in the house and it was already dirty. But I tried to talk to her about it, but she didn't want to talk about it. So that's when I started noticing the house wasn't -- the house was not clean, that [Young] was sometimes not clean, that [Young] sometimes didn't have what he needed.

"Sometimes they would ask -- Debbie would ask for money, although we weren't real sure where the money would go to. She said they were turning the utilities off, or they didn't have money to eat or whatever. So what I tried to do in the alternative was take [Young] out of the house and try to help him and clean his clothes and let him spend some time with me sometimes. And I would try to take [Debra] to the grocery store and let her buy food so that she wouldn't use that money to buy things. They -- Debbie and Johnny would do drugs and alcohol, and that's where their money was going.

"....

"My earliest recollection of when [Young] was probably about three or four years old, and for some reason they had a Chucky doll -- the Chucky doll like from the movie. And [Young] was scared to death of that doll, and Johnny would just terrorize him just relentlessly with that doll. And I got on to him, and I couldn't understand why someone would make a child so scared and be so hurtful. I didn't understand. And not long after that I found out that he was a sex offender

76

and that he had done time in prison for sexual -- sexual abuse of a child."

(Trial R. 1428-32.) She further testified that she had seen Vandiver verbally abuse Young. (Trial R. 1432.)

Dr. Walker testified that she interviewed Young for over 16 hours and that she had conducted extensive research into his background and upbringing by talking to many of his relatives and obtaining many of his records. She testified that she looked at Young's juvenile-court-adjudication records and that included partial records of Department of Human Resources services. She also evaluated jail-incident records from the Colbert County jail and performed cognitive testing on Young and did a neurological assessment and an academic assessment on him. She then reviewed documentation of his stepfather, Johnny Vandiver's status as a registered sex offender. (Trial R. 1452-53.) She said that she interviewed Treena Sidebottom, Young's maternal aunt, for 11 hours; Matt and Nicole Syesta, Young's maternal aunt and uncle, for 2 hours; Alice Syesta, Young's maternal grandmother, for 2 hours; and Carolyn

77

Parrot, William Young's sister,[10] for one hour. (Trial R. 1455.) Dr. Walker further testified: "I wasn't able to speak with some family members because they refused to talk with me. They didn't want to be involved." (Trial R. 1456.) Dr. Walker testified:

"[Dr. Walker]: According to what I was told, [Young] was diagnosed with ADHD, and his behavior was consistent with that. He was impulsive. He was hyperactive. And Carolyn Parrot said he didn't seem like he was fearful of anything, and that's consistent with the impulsivity of ADHD. Everybody described him as extremely close to his mother, and even though she was -- she was abandoning him for all practical purposes, he loved her dearly. And the other thing that I learned was that he was bullied while he was in school. It's not something that he likes to talk about, but he was bullied because of his living situation and also because of his weight."

(Trial R. 1469-70.) Dr. Walker explained that Young's witnessing of the violence in his home made him "more likely to be violent." (Trial R. 1472.)

"[Defense counsel]: In the course of your interviews, did you learn about any other ways that [Young's] mother and stepfather were negative role models for him?

"[Dr. Walker]: They -- his stepfather stole from the neighbors. When somebody new would move in, he would either go -- he would go steal from them. They fought with the neighbors. They used drugs in front of [Young]. And the most egregious to me was when [Young] was nine years old, his mother started smoking marijuana with him."

_____

[10]Young believed that William Young was his father. Dr. Walker testified that there was "conflicting information" as to who was Young's biological father. (Trial R. 1458.)

(Trial R. 1474-75.)

Her investigation, Dr. Walker said, showed that Young had an aggressive disorder, a conduct disorder, and ADHD. (Trial R. 1478.) Dr. Walker further testified that Young told her that when he was a teenager he used: "marijuana, methamphetamine, ice, cocaine, Suboxone, which is a drug that started out being used to treat addiction. Opiates and benzodiazepines or benzos, most people know them as Xanax or Valium." (Trial R. 1484.) Dr. Walker then explained the effect those drugs could have on a young person. (Trial R. 1484-90.) She further testified:

> "According to what his aunt told me, she estimated that [Young's] family moved 30 times in ten years. So he didn't have any kind of a neighbor that might have intervened. There weren't neighbors who got to know the family well enough because, number one, they didn't like them because they were thieves. They never got the chance to intervene. As I mentioned before, they weren't involved in any kind of church family. During the time that his mother was with the Jehovah Witnesses, my understanding was that they did not socialize with nonmembers. So I don't know if [Young] had any involvement with the group.
>
> "There was a lack of commitment to school, even though [Young], as I gave y'all his intelligence level, he was plenty smart to go to school and to be able to do things. But his mother didn't even wake him up to go to school or prepare him for the day. And if you let a kid stay up as late as they want to at night, they are not going to be able to wake up on their own in the morning, for the most part.

79

"The fact that his mother smoked marijuana with him, I would say that was very aggrievance to me because it's giving the sanction to drug abuse to a young child by the most important person in his life. There was no restriction against any kind of drug use in the home. They lived in poor areas. He was exposed to delinquency and violence and associated with irresponsibility and associated with a delinquency environment.

"He had no father in the home. No contact with any paternal role model other than [his stepfather] who was a registered sex offender who abused his mother, was a drug dealer and drug addict."

(Trial R. 1497-99.)

Indeed, the sentencing court found the evidence so compelling that the court made the following statement in its sentencing order:

"The Court heard testimony from [Young's] maternal aunt, [Treena] Sidebottom and Dr. [Carol] Walker outlining the horrible family life upon which [Young] was exposed and brought up in. The Court heard testimony of the poverty and chaos of his home, that both mother (whom he loved very much) and his stepfather were often engaged in criminal activity and were both drug abusers, addicts, and dealers, that [Young] smoked marijuana with his mother when he was only 9 years old, and he has continued to use illegal drugs throughout his life. The testimony regarding [Young's] family life and upbringing was very sad and compelling testimony."

(Trial C. 359.) The sentencing court found that Young's "family background" was a mitigating circumstance. (Trial C. 360.)

80

A.

First, Young argues that his trial counsel failed to investigate and present mitigating evidence that would have supported a sentence of life imprisonment without the possibility of parole. He makes several different allegations concerning this claim.

The trial record shows that defense counsel moved for expenses to hire an investigator and that that motion was granted. (Trial C. 39, 66.) Counsel also moved for expenses to hire a mitigation specialist and filed a supplemental motion requesting more funds for that expert. (Trial C. 42, 78, and 241.) The circuit court approved expenses in the amount of $10,000 for that expert. (Trial C. 272.) Counsel also filed an extensive motion requesting that the State reveal any possible mitigating circumstances: Young's criminal history, any information that the offense was committed while Young was under the influence of any substance, any information regarding Young's culpability in the offense, any information that Young acted under extreme duress or under the domination of another, and numerous other possible mitigating evidence. (Trial C. 100-104.)

"Trial counsel is not ineffective for delegating the responsibility of investigating mitigation evidence to subordinates." Marshall v. State, 182 So. 3d 573, 601 (Ala. Crim. App. 2014).

> "Moreover, 'counsel's method of presenting mitigation ... [is] clearly trial strategy.' Hertz v. State, 941 So.2d 1031, 1044 (Fla. 2006). See also People v. Ratliff, 41 Cal. 3d 675, 697, 224 Cal. Rptr. 705, 715 P.2d 665, 678 (1986) ('[T]he manner of presenting evidence [is] one of trial tactics properly vested in counsel.'). '[T]he presentation of mitigating evidence is a matter of trial strategy.' State v. Keith, 79 Ohio St.3d 514, 530, 684 N.E.2d 47, 63 (1997). 'Matters of trial tactics and trial strategy are rarely interfered with or second-guessed on appeal.' Arthur v. State, 711 So. 2d 1031, 1089 (Ala. Crim. App. 1996), aff'd, 711 So. 2d 1097 (Ala. 1997)."

Clark v. State, 196 So. 3d 285, 315-16 (Ala. Crim. App. 2015).

> " 'The inquiry of whether trial counsel failed to investigate and present mitigating evidence turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented.' "

McMillan v. State, 258 So. 3d 1154, 1168 (Ala. Crim. App. 2017), quoting Commonwealth v. Simpson, 620 Pa. 60, 100, 66 A.3d 253, 277 (2013).

With these principles in mind, we review the claims raised by Young in this section of his brief to this Court.

1.

Young first argues that his trial counsel failed to investigate and present evidence concerning his mother's mental illness, his mother's suicide attempts, his mother's inability to take care of him, and the impact of his upbringing and his mother's suicide attempts on Young's life. Specifically, Young asserts that counsel should have conducted an adequate investigation and obtained a copy of his mother's medical records from Riverbend Center for Mental Health ("Riverbend").

In summarily dismissing this claim, the postconviction court made the following findings:

> "Young claims Debra's Riverbend records were 'essential for any meaningful evidentiary presentation related to Debra Vandiver's mental health and treatment.' Young also alleges that those records would have proved that Debra's illnesses were significant and persuasive.
>
> "…. Once again, Young makes a conclusory claim that these records were essential when Dr. Walker and [Sidebottom] gave extensive insight into Debra's mental health issues. Young similarly fails to explain how the evidence presented at trial about Debra's mental illness was not significant and pervasive. [Sidebottom] testified that Debra cut herself, tried to commit suicide multiple times, and that several of Debra's attempts resulted in hospitalization. Dr. Walker likewise testified that Debra was likely bipolar and made several serious suicide attempts. Moreover, Young fails to explain how documents covering the same facts would not have been cumulative.

83

"Young claims these records reveal that Debra was diagnosed with depressive disorder, obesity, borderline personality disorder, and was told that she needed to establish a better home life for Young.

"…. Dr. Walker testified that Debra had depressive disorder and likely had bipolar disorder. Moreover, Dr. Walker testified, when speaking of obesity, that Debra was reported to be between 300-500 pounds. Finally, evidence was presented that Debra did not provide a good home life for Young. Additional evidence of the same would have been cumulative.

"Young claims these records reveal Debra's inability to keep a job, her Social Security disability benefits, and her lack of an income.

"… Young fails to explain how documentary evidence that Debra could not hold a job, received government benefits, and lacked an income was necessary and not cumulative when testimony was given to the same effect. Indeed, Dr. Walker testified that Young lived in poor areas. [Sidebottom] also testified that Young and Debra lived in government housing. Dr. Walker testified that Debra did not support herself with a job 'as there was not an emphasis placed on self-support. They stole.' Moreover, Dr. Walker testified that Debra and Young lived off government benefits as she received social security or social security disability benefits. Failure to present additional evidence of the same would have been cumulative."

(C. 727-29.)

In relation to Young's mother's suicide attempts, the postconviction court stated:

"[Sidebottom], Debra's sister, testified that Debra cut herself and was once found unresponsive on the floor after an apparent suicide attempt. According to [Sidebottom], Debra had to be taken to the hospital. [Sidebottom] likewise testified that on other occasions, Debra's suicide attempts resulted in hospitalization. Dr. Carol Walker, Young's hired clinical psychologist, also described Debra's suicide attempts as serious. [Sidebottom] and Dr. Walker both testified that Debra tried to commit suicide 'many times.' Furthermore, Dr. Walker testified that Debra died of an intentional overdose. Thus, counsel knew, as did the jury, that Debra had tried to commit suicide several times, that her attempts were serious, and that she had likely died of an overdose, and records of these events would have been merely cumulative.

"Young claims that Debra's records from Riverbend would have documented that she attempted suicide when Young was an infant, four years old, and eight years old, the last of which he witnessed. According to Young, counsel failed to elicit testimony from [Sidebottom] about Young's witnessing of Debra's suicide attempt. …

"Regarding Debra's suicide attempt that Young actually witnessed, Young fails to satisfy the specificity and full factual pleading requirements of Rule 32.3 and 32.6(b) and to state a valid claim for relief or present a material issue of fact or law under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. Young claims that the jury did not learn how severe this attempt was, but Young fails to plead how knowing this information likely would have changed his sentence. Furthermore, Young claims that he saw this suicide attempt, but he does not plead how this impacted his development."

(C. 713-15.)

As stated above in the synopsis of the evidence presented at the penalty phase, a great deal of the mitigating evidence that Young asserts was not presented concerning Young's mother was, in fact, presented at sentencing through the testimony of Sidebottom and Dr. Walker. "Counsel cannot be ineffective for not presenting evidence that counsel did, in fact, present." Clark v. State, 196 So. 3d 285, 318 (Ala. Crim. App. 2015). "'[A] claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant argues should have been presented.'" Walker v. State, 194 So. 3d 253, 288 (Ala. Crim. App. 2015), quoting Frances v. State, 143 So. 3d 340, 356 (Fla. 2014).

> "'A trial court may summarily dismiss a post-conviction petition [on a claim of ineffective assistance of counsel] when it is clear upon the face of the petition itself or the exhibits or material from prior proceedings that there are no facts upon which the petitioner could prevail. Robertson v. State, 669 So. 2d 11 (Miss. 1996). See also Taylor v. State, 782 So.2d 166, 168 (¶4) (Miss. Ct. App. 2000).'
>
> "Fairley v. State, 812 So. 2d 259, 262 (Miss. Ct. App. 2002). 'A petitioner's failure to "show how, but for the attorneys' errors, the results of the proceedings would have been different" justifies a district court's decision to summarily dismiss the

ineffective assistance of counsel claim.' Everett v. State, 757 N.W.2d 530, 535 (N.D. 2008) (quoting Hughes v. State, 639 N.W.2d 696, 699 (N.D. 2002)). '[F]ailing to introduce additional mitigation evidence that is only cumulative of that already presented does not amount to ineffective assistance.' Jalowiec v. Bradshaw, 657 F.3d 293, 319 (6th Cir. 2011) (citing Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir. 2007)).

> "'"[I]n order to establish prejudice, the new evidence that a [postconviction] petitioner presents must differ in a substantial way -- in strength and subject matter -- from the evidence actually presented at sentencing." Hill v. Mitchell, 400 F.3d 308, 319 (6th Cir.), cert. denied, 546 U.S. 1039, 126 S.Ct. 744, 163 L.Ed.2d 582 (2005). In other cases, we have found prejudice because the new mitigating evidence is "different from and much stronger than the evidence presented on direct appeal," "much more extensive, powerful, and corroborated," and "sufficiently different and weighty." Goodwin v. Johnson, 632 F.3d 301, 328, 331 (6th Cir. 2011). We have also based our assessment on "the volume and compelling nature of th[e new] evidence." Morales v. Mitchell, 507 F.3d 916, 935 (6th Cir. 2007). If the testimony "would have added nothing of value," then its absence was not prejudicial. [Bobby v.] Van Hook, [558 U.S. 4, 12,] 130 S.Ct. [13,] 19 [ (2009)]. In short, "cumulative mitigation evidence" will not suffice. Landrum v. Mitchell, 625 F.3d 905, 930 (6th Cir. 2010), petition for cert. filed (Apr. 4, 2011) (10-9911).'

"Foust v. Houk, 655 F.3d 524, 539 (6th Cir. 2011).

Stallworth v. State, 171 So. 3d 53, 79-80 (Ala. Crim. App. 2013).

87

"'"[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir. 2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir. 2006)).' Eley v. Bagley, 604 F.3d 958, 968 (6th Cir. 2010). 'This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.' United States v. Harris, 408 F.3d 186, 191 (5th Cir. 2005). 'Although as an afterthought this [defendant's father] provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.' Darling v. State, 966 So. 2d 366, 377 (Fla. 2007)."

Daniel v. State, 86 So. 3d 405, 429-30 (Ala. Crim. App. 2011).

This claim was properly summarily dismissed because there was no material issue of fact or law that would entitle Young to relief. See Rule 32.7(d), Ala. R. Crim. P.

Furthermore, Young was 28 years of age at the time of the shootings. Many courts have discussed the effectiveness of presenting testimony concerning a troubled childhood when the defendant was an adult when the murder was committed.

"'[T]rial counsel's decision not to investigate and present evidence regarding Francis's family background does not amount to deficient assistance. Under certain circumstances, trial counsel's decision not to investigate family childhood background may legitimately be the

88

> product of a reasoned tactical choice. See <u>Stanley v. Zant</u>, 697 F.2d 955, 970 (11th Cir. 1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984). Given the particular circumstances of this case including, among other things, the fact that Francis was thirty-one years old when he murdered Titus Waters, evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight. See <u>Francois v. Wainwright</u>, 763 F.2d 1188, 1191 (11th Cir. 1985). Consequently, trial counsel cannot be faulted for expending his limited time and resources on other vital areas.'"

<u>Washington v. State</u>, 95 So. 3d 26, 44-45 (Ala. Crim. App. 2012), quoting <u>Francis v. Dugger</u>, 908 F.2d 696, 703 (11th Cir. 1990).

This is not a case where counsel failed to conduct any mitigation investigation or where counsel failed to present any mitigation. The mitigation that was presented was compelling as stated by the sentencing judge. For the forgoing reasons, this claim was correctly summarily dismissed. Accordingly, Young is due no relief on this claim.

2.

Young next argues that his trial counsel was ineffective because of the "weak testimony" counsel presented concerning Young's having been diagnosed with ADHD when he was a child.

89

The postconviction court found that there was no material issue of fact or law that would entitle Young to relief. In dismissing this claim, the court stated:

> "While Dr. Walker testified that there was no evidence in the records that she received indicating that Young had received treatment for ADHD, she testified that she had been told by family members that Young was taking stimulant medication for his ADHD. Dr. Walker also testified that Young was given a conditional diagnosis of disruptive disorder, conduct disorder, and ADHD, as well as received medication for mood swings, while at Three Springs treatment facility [when he was a teenager]. Thus, this information was presented to the jury, and additional evidence of the same, whether it be through records or the testimony of [Sidebottom], would have been cumulative."

(C. 730.)

As the record shows, counsel chose to present evidence of Young's ADHD through the testimony of Sidebottom and Dr. Walker. Dr. Walker's testimony was based, in part, on records that she had examined from Three Springs treatment facility.[11] "'[C]ounsel's method of presenting mitigation ... [is] clearly trial strategy.' Hertz v. State, 941 So. 2d 1031, 1044 (Fla. 2006)." Clark v. State, 196 So. 3d 285, 315 (Ala. Crim. App. 2015).

---

[11]Three Springs was a juvenile treatment facility that housed young juvenile offenders.

"A trial strategy decision may only serve as a basis for ineffective counsel if the decision is unreasonable. Zink [v. State], 278 S.W.3d [170] at 176 [(Mo. 2009)]. The choice of one reasonable trial strategy over another is not ineffective assistance. Id. '[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable.' Anderson [v. State], 196 S.W.3d [28] at 33 [(Mo. 2006)] (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052)."

McLaughlin v. State, 378 S.W.3d 328, 337 (Mo. 2012). "[A] tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was 'so patently unreasonable that no competent attorney would have chosen it.'" Brown v. State, 288 Ga. 902, 909, 708 S.E.2d 294, 301 (2011). For these reasons, this claim was properly summarily dismissed, and Young is due no relief on this claim.

3.

Young next argues that his counsel was ineffective for failing to present testimony concerning Johnny Vandiver's violence and cruelty toward Young. Specifically, Young argues that counsel should have presented the testimony of Scott Dishon, Julian Smith, and Joseph Young concerning Vandiver's treatment of Young.

Young pleaded that Dishon would have testified that he was a childhood friend of Young's from the age of 10 to 12 and that Young's

91

stepfather was a "psycho" who frequently cursed at Young. Smith would have testified that he frequently witnessed Young's stepfather yelling at Young and at Young's mother. Joseph Young would have testified that he went to visit Young when he was 11 years old and left after "Vandiver was physically violent with" him. (C. 76.) Young did not plead what Vandiver did to Joseph Young that caused him to leave.

The postconviction court found that this claim was not sufficiently pleaded because Young failed to plead that the witnesses were willing and able to testify at Young's trial. (C. 731-32.)

Moreover, the trial record shows that Sidebottom testified that Vandiver was physically abusive to her sister, that she had witnessed him restrain her, that she had witnessed him hit her in the face, that she had witnessed him grab her by the hair, and that she had witnessed him verbally abuse her. She further testified that she had also witnessed Vandiver verbally abuse Young. (Trial R. 1432.) She detailed a specific instance:

> "My earliest recollection of when [Young] was probably about three or four years old, and for some reason they had a Chucky doll -- the Chucky doll like from the movie. And [Young] was scared to death of that doll, and Johnny would just terrorize him just relentlessly with that doll. And I got on to him, and I couldn't understand why someone would

make a child so scared and be so hurtful. I didn't understand. And not long after that I found out that he was a sex offender and that he had done time in prison for sexual -- sexual abuse of a child."

(Trial R. 1431-32.) Thus, evidence was presented that Vandiver was verbally abusive and cruel to Young.

"[T]his Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence. See Gudinas v. State, 816 So. 2d 1095, 1106 (Fla. 2002); Sweet v. State, 810 So. 2d 854, 863-64 (Fla. 2002). Therefore, trial counsel was not ineffective for failing to call Carlton as a witness during the penalty phase to present evidence which was generally presented by others."

Darling v. State, 966 So. 2d 366, 377 (Fla. 2007). Accordingly, there was no material issue of fact or law that would entitle Young to relief on this issue, thus, summary dismissal was proper. Young is due no relief on this claim.

4.

Young next argues that his trial counsel was ineffective for failing to investigate and present physical records of Johnny Vandiver's sexual-assault conviction.

In dismissing this claim, the postconviction court stated:

"Young fails to satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) and to state a valid

93

claim for relief or present a material issue of fact or law under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. Young claims that this information was easily and readily available, but he fails to explain how the records were easily available. Young likewise fails to plead facts showing that these records would have been admissible as relevant. Introducing the facts about another, unrelated case would likely have received an objection from the State on relevance grounds. … Young fails to explain how evidence of Johnny's sexual abuse against his stepdaughter is at all relevant when Young does not claim that Johnny also sexually abused him. Moreover, Young fails to plead why the details of Johnny's sexual assault case were necessary and not cumulative when the jury heard multiple times that Johnny had sexually abused his stepdaughter."

(C. 733-34.)

The trial record shows that on numerous occasions during Sidebottom's and Dr. Walker's testimony they stated that Vandiver had a prior sexual-abuse conviction. Trial counsel's decision to present this through testimony instead of physical records was clearly a strategic decision. Thus, there was no material issue of fact or law that would entitle Young to relief on this claim. See Rule 32.7(d), Ala. R. Crim. P. Accordingly, Young is due no relief on this claim.

5.

94

Young next argues that his counsel failed to investigate and present evidence of abuse and mental illness in Young's extended family specifically, that Young's maternal uncle had mental problems.

In dismissing this claim, the postconviction court stated:

"Young failed to plead how, and from where, counsel could have obtained the private records of a private patient of Young's non-immediate family. Young likewise fails to explain how these records would have been admissible and what witness could have properly laid the foundation for these records when Patrick and Paul[12] did not testify. Moreover Young fails to explain why records of Patrick's mental health were necessary and not cumulative when [Sidebottom] testified to Patrick's mental health issues, including that he was put in a mental health facility. …

"Regarding the abuse of Paul, Dr. Walker testified that there were many members of Young's family that refused to talk to her. Young fails to plead that Matthew was not one of those people. Young likewise fails to plead that Matthew was available and willing to testify in this case when Matthew has been completely absent from Young's life. Furthermore, Young fails to explain why records of Paul's abuse were necessary when the jury heard about Alice's mental health issues and abuse of her family."

(C. 734-36.)

The trial record shows that defense counsel asked Sidebottom if any of her siblings had mental problems. (Trial R. 1423.) She testified that

---

[12]Paul is Sidebottom's oldest brother; Patrick is another brother.

95

her oldest brother, Paul, was abusive and violent and that another brother, Patrick, had been put in a mental-health facility in Tarrant County in Fort Worth. Patrick had also tried to commit suicide at that facility and when he was sent home, he again tried to commit suicide by overdosing on Xanax. (Trial R. 1425.) Testimony was presented about Young's extended family's mental health. Thus, summary dismissal of this claim was proper; therefore, Young was due no relief on this claim.

6.

Young next argues that counsel was ineffective for failing to investigate and present evidence indicating that Young's grandfather was supportive of his mother and that Young lost his mother and grandfather within weeks of each other.

In dismissing this claim, the postconviction court stated:

"Dr. Walker testified that Paul [Young's grandfather] was supportive of Debra. Young fails to plead how it is not obvious from this testimony that by supporting Debra, Paul also supported Young. Young likewise fails to plead who would have, or could have, testified that Paul encouraged Young to participate in the family.

"Young claims that [Sidebottom] could have testified about his relationship with Paul and about the fact that Paul died within weeks of his mother's suicide and within days of Young's release from prison. However, Young fails to explain the significance of this event. Importantly, Young does not

96

> claim that the timing of Paul's death, or that Paul's death in general, had a negative impact on his psychological well-being. Young likewise fails to plead how [Sidebottom] would have testified that once Young was released from prison, he had no support from family, when [Sidebottom] herself testified that she loves Young. Such 'bare claims' are insufficient to warrant further proceedings."

(C. 735-37.)

Young pleaded that counsel should have presented evidence indicating that Young's grandfather was supportive of him but failed to plead the identity of any individual who could have provided such testimony. Nor did Young plead how the death of Young's mother and grandfather affected him. The full facts were not pleaded in regard to this claim. See Rule 32.7(d), Ala. R. Crim. P.

Moreover, the record shows that testimony was presented that Young's grandfather was supportive of Young's mother. Sidebottom testified that when Debra had Young, her father moved her and the baby back into their house in Florence. (Trial R. 1415.) It was clear from Sidebottom's testimony that her father had been helpful to his children and that her mother was the one that was abusive. Dr. Walker testified that "Paul Syesta was supportive of Debbie. ..." (Trial R. 1459.) Thus, summary dismissal was proper, and Young is due no relief on this claim.

7.

Young next argues that his trial counsel was ineffective for failing to present an expert on trauma and its impact on child development. Young pleaded that Dr. Paul O'Leary, a psychiatrist, was willing to testify concerning the effect that Young's traumatic childhood had on his development. (C. 81.)

In finding that this claim was meritless, the postconviction court made the following findings of fact:

"Young does not explain how Dr. [Carol] Walker, the defense's expert, was not qualified to testify on such subjects, and thus, why another expert was needed. Indeed, Dr. Walker has a Ph.D. in medical clinical psychology. She is also board certified in clinical neuropsychology. Dr. Walker explained that neuropsychology 'looks after those relationships between the brain and behavior.' And, importantly, Dr. Walker explained that she has been qualified as an expert to discuss cognitive issues related to trauma and neurodevelopmental disorders. … Dr. Walker testified that Young had an attachment to his mother, explaining that he ran away from a treatment facility to be with her. Dr. Walker testified that Young had problems with mood swings and had to be on medication for it. Dr. Walker testified that Young has been unable to maintain long-term relationships in his life, that all of his relationships were short-term, and that, in some of his relationships, Young would propose after having known his girlfriend for a few weeks. The record reflects that Dr. Walker walked through the trauma that Young had experienced in his life, including his mother's serious suicide attempts and mental illnesses, poverty, his learning disabilities, his mother and stepfather's life of crime, his

98

> chaotic and unstable home, as well as the verbal abuse and neglect he received. Then after explaining the trauma of Young's life, Dr. Walker testified to some of the symptoms of that trauma seen in Young's personal, social, and academic life. … Dr. Walker's testimony addressed the impact the trauma in Young's life had on his development and its relation to this crime, and Young fails to plead that Dr. [Paul] O'Leary's testimony would have been different. The fact of the record, then, reveals that Young's claim is meritless."

(C. 737-41.)

As stated above when discussing Dr. Walker's testimony, her testimony detailed the trauma Young suffered in his childhood and its impact on his life. "[C]ounsel 'is not ineffective for failing to shop for an expert that would testify in a particular way." Glass v. State, 227 S.W.3d 463, 484 (Mo Banc 2007). Therefore, this claim presented no material issue of fact or law that would entitle Young to relief. See Rule 32.7(d), Ala. R. Crim. P. Accordingly, Young is due no relief on this claim.

### B.

Young next argues that his trial counsel was ineffective in opening and closing statements in the penalty phase because, he says, counsel did not articulate a coherent theory as to why Young should be sentenced to life imprisonment without the possibility of parole.

The postconviction court made the following findings when dismissing this claim:

"The record clearly reflects that counsel mentioned specific examples of Young's traumatic childhood. Counsel stated that Young's mother abused drugs and was not stable, [that] Young never had a sense of community, [that] his only male role model was a sex offender, [that] his stepfather abused drugs and his mother, and [that] he lost his mother who he dearly loved. Though counsel does not mention Debra's suicide attempts and Paul's passing, Young fails to plead how counsel's 'failure' render counsel's statements incoherent.

"Young claims that counsel failed to challenge the State's two aggravating circumstances in opening statements, instead opting to argue these points in closing, thus eliminating the State's burden of proof, but Young fails to explain how counsel's decision to address the State's aggravating circumstances in closing rather than in opening statements eliminated the State's burden of proof. Young fails to plead how this was not a matter of sound trial strategy, ensuring that the jury focused on the trauma of Young's life by talking about it in opening statements. Moreover, Young fails to explain how counsel's strategic decision actually prejudiced him.

"Young claims that counsel's closing argument was haphazard and offered only a cursory list of his traumatic life experiences, but Young completely fails to specify what counsel should have said instead. Nor does Young explain how counsel's actions fell below an objective standard of reasonableness. Moreover, Young does not specifically plead how there is a reasonable probability that he would not have been sentenced to death but-for counsel's alleged errors. Rather, Young presents a conclusory allegation that he was

prejudiced. Such 'bare claims' are insufficient to warrant further proceedings. Rule 32.6(b), Ala. R. Crim. P."

(C. 742-43.)

The record shows that trial counsel had a coherent closing argument that discussed many mitigation factors. That argument stated, in part:

"[Young's] father figure, Johnny Vandiver, he was a registered sex offender. He used drugs and participated regularly in criminal activity. [Young] had no parental roots. His mother abused drugs, quite possibly while she was pregnant with [Young]. [Young] witnessed parental drug use while growing up. She began smoking marijuana with him when he was nine years old. [Young's] family moved a lot and never established placement in a community. He never had a place. I grew up in Ford City, and many of you probably know where that is. That's my home. [Young] can't say where his home is. [Young] witnessed domestic violence against his mother. There's no family commitment to education, and he missed a lot of school. [Young] spent a lot of time in group homes and boot camps, and his mother didn't even come to visit with him. [Young] has ADHD, and that's another issue. [Young's] family had a lack of family unity. [Young] never saw anyone in his home keep a steady job. You know the older I get it seems to me the more important that is. For kids to see somebody working, doing something with themselves.

"And another one that we haven't talked about here that has come out in the guilt-phase trial, [Young] didn't shoot Mr. Freeman. Now, is he guilty of capital murder? Yes. Okay. But a mitigating factor is, [Young] did not shoot him. There is no evidence whatsoever that the gun that [Young] had even hit the car. As a matter of fact, [the prosecutor] even made

mention of that in his closing statement, if you do recall. That is a mitigating factor."

(Trial R. 1555-56.) Also, the argument was so effective that the sentencing court found that Young's childhood was a mitigating circumstance. For the above-stated reasons, summary dismissal of this claim was proper, and Young is due no relief on this claim.

## C.

Young argues that counsel was ineffective in failing to adequately prepare and elicit testimony from Dr. Carol Walker. Specifically, Young pleaded that Dr. Walker should have given more detail about his mother's mental illness and more detail about his childhood.

The postconviction court made the following findings on this claim:

"The record reflects that Dr. Walker presented effective testimony concerning Debra's illnesses. Dr. Walker testified twice that Debra likely died of suicide. Dr. Walker testified that Debra had a history of depression and likely had bipolar disorder. Dr. Walker testified that everyone she spoke to told her that Debra made several serious suicide attempts. Dr. Walker explained that Debra had tried multiple times to commit -- one such time Young witnessed. Finally, Dr. Walker testified that Debra was treated for her mental conditions. Young fails to plead why more information about Debra's mental health was needed for counsel to effectively prepare Dr. Walker's testimony about this subject.

"Young claims that Dr. Walker's testimony about his trauma was incoherent and non-specific, but Young fails to

102

explain which parts of her testimony were problematic and he fails to provide examples of how her testimony could have been more specific. He claims that Dr. Walker gave damaging testimony about his intellectual capability, but he fails to explain how her testimony could have been tempered with further preparation with trial counsel. Dr. Walker performed an intellectual assessment on Young that showed he was of average to above average intelligence, and she testified to this fact. Young fails to plead how counsel could have avoided the results of this assessment or how counsel could have better coached Dr. Walker in her answers in this regard -- the assessment reveals what it reveals.

"Young claims that Dr. Walker failed to give effective testimony regarding the ongoing impact of his trauma because the jury did not hear specifics, was not given dates, and was not presented with a meaningful timeline. However, the record reflects that Dr. Walker shared the trauma that Young had experienced in his life, including his mother's multiple, serious suicide attempts, his mother's mental illnesses, poverty, learning disabilities, his mother and stepfather's life of crime, his mother's likely suicide, his chaotic and unstable home, and the verbal abuse and neglect he received. After explaining the trauma seen in Young's personal, social, and academic life. Then, at the end of her testimony, Dr. Walker explained how the trauma of Young's life, or 'effective factors,' could have played a part in Young committing this crime. Young fails to plead how such testimony, despite the absence of dates, was not effective or meaningful."

(C. 744-46.)

First, Young did not plead what counsel should have done in order to "properly" prepare Dr. Walker to testify. Second, defense counsel's examination of Dr. Walker was very thorough and effective. A review of

103

the penalty phase shows that counsel's presentation of the evidence was effective. Accordingly, this claim was properly summarily dismissed, and Young is due no relief on this claim.

D.

Young next argues that his counsel was ineffective for failing to effectively prepare and question Treena Sidebottom, Young's maternal aunt who testified at the penalty phase.

The pleadings on this claim consist of the following, in part:

"[C]ounsel's failure to adequately investigate and obtain all relevant records including Debra Vandiver's Riverbend records and talk to numerous witnesses prior to preparing and presenting Sidebottom's testimony prejudiced Young. Counsel failed to elicit important information that Sidebottom could have shared with the jury."

(C. 87.)

The postconviction court, in dismissing this claim, stated:

"Young fails to plead why Debra's Riverbend records were necessary for [Sidebottom] to give adequate testimony about Debra's mental illnesses. [Sidebottom] testified that Debra tried to commit suicide, indicating that Debra was depressed. Young likewise fails to explain why further testimony from [Sidebottom] was needed when Dr. Walker testified that Debra had depression and likely had bipolar disorder and obesity. Nor does Young plead how [Sidebottom] could have testified about Debra's mental illnesses further when the trial court instructed her that she could not 'testify to diagnosis and that type of thing.'

104

"Young similarly fails to adequately plead why knowledge that [Sidebottom] tried to assist Debra four times after her suicide attempts was necessary when [Sidebottom] testified generally that she tried to assist Debra after her suicide attempts. The record likewise reflects that [Sidebottom] was so concerned about her sister that she thought about adopting Young, but worried about what that would do to her sister's mental health.

"Furthermore, Young claims that 'it was critical [on re-direct] to elicit testimony from Sidebottom to explain Sidebottom's different outcome in adult life compared to her sister Debra's.' Young fails to plead how counsel could have done this or what counsel should have asked. The record reveals, however, that [Sidebottom] gave this testimony. Indeed, [Sidebottom] gave testimony highlighting the differences in her adult life and Debra's adult life despite their rough upbringing. Moreover, Young's claim that [Sidebottom] did not testify about the different mental and psychiatric realities of the sibling pairs is without merit. Young fails to explain how [Sidebottom] could have given any more detail than what she did, considering the trial court's order limiting her testimony on the subject."

(C. 748-50.)

Sidebottom's testimony was detailed and effective. Young's mitigation expert, Dr. Walker, testified that she spent 11 hours talking with Sidebottom. There was no material issue of fact or law that would entitle Young to relief under Strickland. See Rule 32.7(d), Ala. R. Crim. P. Thus, summary dismissal of this claim was proper, and Young is due no relief on this claim.

105

E.

Young next argues that his trial counsel was ineffective for failing to challenge the State's case in aggravation. He makes several different arguments in support of this contention.

1.

First, Young argues that counsel was ineffective for failing to investigate his prior felony conviction for robbery in the third degree. He also argues that trial counsel was ineffective in not challenging his conviction at this trial for discharging a weapon into an occupied vehicle because, he says, the jury was free to consider that felony as an aggravating circumstance.

In summarily dismissing this claim, the postconviction court stated:

"Young fails to explain how knowing the underlying facts of his third-degree robbery conviction would have tempered the State's aggravation case. Indeed, Young was convicted of a violent felony, and he does not plead facts that show otherwise. Such 'bare claims' are insufficient to warrant further proceedings.

"....

"Moreover, Young's claim that the jury was invited to consider his conviction for discharging a firearm into an occupied vehicle as an additional felony during sentencing is without merit. Indeed, the trial court specifically instructed the jury that it could only consider as aggravating

106

> circumstances Young's prior felony convictions for robbery in the third degree and assault in the second degree. For this reason, a special instruction and verdict form were not necessary or warranted."

(C. 751-53.)

First, Young pleaded no circumstances surrounding his prior conviction for robbery in the third degree except that he had stolen a bicycle. No other facts surrounding that conviction were pleaded in Young's petition. Young merely pleaded "bare fact" in support of this claim; thus, summary dismissal was proper. See Rule 32.6(b), Ala. R. Crim. App.

Second, the circuit court's jury charge in the penalty phase stated that the jury could consider as aggravating circumstances only Young's conviction for robbery in the third degree and his conviction for assault. (Trial R. 1566.) The jury was not invited to consider an improper felony in aggravation. Thus, this claim presented no material issue of fact or law that would entitle Young to relief. Accordingly, Young is due no relief on these claims.

2.

Young next argues that his trial counsel was ineffective for failing to challenge the aggravating circumstance that Young's conduct of shooting in a parking lot created a great risk of death to many persons.

The postconviction court found that this claim was due to be dismissed because the underlying argument in support of the ineffective-assistance-of-counsel claim had been addressed by this Court on direct appeal. This Court stated, in part:

> "The evidence at trial showed that after Young parked the white pickup truck at the Spring Creek Apartments and got out of the vehicle with Capote, one or both of them shot at Freeman at least 15 times. Det. Holland testified that after the shooting there were shell casings scattered 'all over the parking lot.' The surveillance footage shows several vehicles in the parking lot near the shooting. Less than a minute after the shooting a man can be seen on the surveillance footage opening an apartment door and peering outside. Lt. Wear, who arrived at the Spring Creek Apartments less than five minutes after the shooting, testified that when he arrived there were '[a] lot of people' at the scene, and two or three witnesses told him that a white truck had left the scene. Captain Setliff testified that when he arrived at the scene less than 30 minutes after the shooting there were people '[a]ll the way around the parking lot.' He estimated there were 'at least 75 to 100' people in the parking lot. Sumerel, the apartment's property manager, testified that there are 60 units in the Spring Creek Apartments with a total capacity of 224 people. She testified that in March 2016 at least 55 of the 60 units were full, mostly of women and children.

"This evidence, showing that there were people in the residential area where the shooting happened, was enough for the circuit court to submit to the jury the question whether Young 'knowingly created a great risk of death to many persons,' and for the jury to find – and the circuit court to consider and weigh – that aggravating circumstance."

Young, ___ So. 3d at ___.

The trial record reflects that defense counsel did present some argument against this aggravating circumstance.  In the circuit court's order sentencing Young to death, the court referenced this argument: "The Court heard defense counsel argue that the aggravating circumstance of defendant knowingly creating a great risk of death to many persons being weak in this case, and that had the deceased not been sitting his car but standing outside of his car it would not have been capital murder."  (Trial C. 350-51.)

Thus, this claim was correctly summarily dismissed because the underlying claim had no merit.  Counsel cannot be ineffective for failing to raise a claim that has no merit.  See Bush v. State, 92 So. 3d 121 (Ala. Crim. App. 2009).  For these reasons, Young is due no relief on this claim.

## V.

Young next argues that the postconviction court erred in denying his motion for discovery. The record shows that Young filed two motions for discovery. His argument on this claim does not identify which motion Young is challenging on appeal. (Young's brief at p. 95.)

The record shows that Young filed a "motion for discovery of prosecution files, records, and information necessary for a fair Rule 32 proceeding." (C. 253.) At the same time, Young also filed a "motion for discovery of institutional, files, records, and information necessary for a fair Rule 32 proceeding." (C. 274.) The State moved that the postconviction court first dispose of the motion to dismiss the Rule 32 petition that was pending before disposing of the motions for discovery. (C. 295.)

In Alabama, there is no inherent right to discovery in a postconviction proceeding. The Alabama Supreme Court has held that to be entitled to discovery in Rule 32 proceedings, a petitioner must establish "good cause" for the requested discovery. See State v. Martin, 69 So. 3d 94 (Ala. 2011), and Ex parte Land, 775 So. 2d 847 (Ala. 2000).

> "Morris was not entitled to discovery, because the claims for which he sought discovery were either insufficiently pleaded, procedurally barred, or meritless, and they were dismissed. We have held in the previous sections of this

110

opinion that the circuit court did not err by summarily dismissing Morris's claims, and it follows that Morris did not meet the good-cause standard for obtaining postconviction discovery. Accordingly, the circuit court did not commit error when it denied Morris's postconviction discovery requests. See, e.g., <u>Davis v. State</u>, 184 So.3d 415, 447 (Ala. Crim. App. 2014)."

<u>Morris v. State</u>, 261 So. 3d 1181, 1202 (Ala. Crim. App. 2016). Likewise, the postconviction court did not err by failing to grant Young's motion for discovery. Accordingly, Young is due no relief on this claim.

## VI.

Last, Young argues that the postconviction court's wholesale adoption of the State's summary-dismissal order violates State and federal law. He argues that aside from the deletion of one paragraph, the final order is the same as the State's proposed order and that it suffers from the same typographical errors.

Young filed a lengthy objection to the postconviction court's wholesale adoption of the State's order. (C. 764.)

"[T]he general rule is that, where a trial court does in fact adopt the proposed order as its own, deference is owed to that order in the same measure as any other order of the trial court. In <u>Dobyne v. State</u>, 805 So. 2d 733, 741 (Ala. Crim. App. 2000), the Court of Criminal Appeals stated:

"'"'While the practice of adopting the state's proposed findings and conclusions is subject to

111

> criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.'"'

"805 So. 2d at 741 (quoting other cases; emphasis added). In McGahee v. State, 885 So. 2d 191, 229-30 (Ala. Crim. App. 2003), the Court of Criminal Appeals stated that 'even when a trial court adopts verbatim a party's proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.' Cf. United States v. El Paso Natural Gas Co., 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) (expressing disapproval of the 'mechanical' adoption of findings of fact prepared by a party, but stating that such findings are formally those of the trial judge and 'are not to be rejected out-of-hand')."

Ex parte Ingram, 51 So. 3d 1119, 1122-23 (Ala. 2010). The Alabama Supreme Court has found error in the adoption of a proposed order when the court adopted one of the pleadings of the State, Ex parte Scott, 262 So. 3d 1266 (Ala. 2011), and when the court adopted an order that incorporated statements that the findings were based on personal knowledge of the judge when the judge issuing the order did not preside over the trial. See Miller v. State, 99 So. 3d 349 (Ala. Crim. App. 2011). This Court has not reversed a court's adoption of a proposed order when that order contained merely typographical errors. See Ex parte Ingram, supra.

112

In this case, there is nothing to indicate that the order adopted from the State's proposed order was not the judge's own independent judgment or that it was "merely an unexamined adoption of the proposed order submitted by the State." Mashburn, 148 So. 3d at 1113. We find that the postconviction-court's findings are not clearly erroneous. Thus, Young is due no relief on this claim.

For the foregoing reasons, we affirm the circuit court's summary dismissal of Young's postconviction petition attacking his capital-murder conviction and sentence of death.

AFFIRMED.

Windom, P.J., and McCool, Cole, and Minor, JJ., concur.